### THE KONGOSAN MARU.

#### YOUNG et ux. v. MITSUI & CO. et al.

(District Court, D. Oregon. July 10, 1922.)

No. A-8695.

1. **Shipping ☞84(1)—Unless negligent, ship not liable for injury to employee of contracting stevedore.**

   A ship, in safe condition when placed in charge of a stevedoring company, as an independent contractor, for discharging and loading, is not liable in admiralty for injuries to employees of such company.

2. **Master and servant ☞120, 236(10)—Injury to stevedore due to negligence of master and contributory negligence.**

   Injury to an employee of a stevedoring company by falling through a hatchway *held* due to negligence of the company in leaving the hatchway uncovered after work had ceased at night and insufficiently lighted, and also to contributory negligence of the employee, who knew of the open hatchway and with due care would have avoided it.

3. **Master and servant ☞185(7)—Duty to provide place to work nondelegable.**

   That the act of negligence which rendered a place to work unsafe and caused the injury of an employee was that of fellow servants does not relieve the master from liability for the injury.

In Admiralty. Suit by George Young and Cora Young, his wife, against the steamship Kongosan Maru, Mitsui & Company, claimant. and the Griffiths & Sprague Stevedoring Company. Decree for half damages against the Stevedoring Company alone.

Eugene A. Childe, of Seattle, Wash., and Bauer, Greene & McCurtain, of Portland, Or., for libelants.

Trefethen & Findley, of Seattle, Wash., and John K. Kollock, of Portland, Or., for the Kongosan Maru and Mitsui & Co.

E. L. McDougal, of Portland, Or., for Griffiths & Sprague Stevedoring Co.

WOLVERTON, District Judge. This is a libel to recover damages for personal injuries which it is alleged ensued because of the negligence of respondents the steamship Kongosan Maru and Griffiths & Sprague Stevedoring Company.

The Kongosan Maru, on its arrival at the East Waterway dock in Seattle on October 15, 1920, was turned over by its owners and claimants to respondent Griffiths & Sprague Stevedoring Company for discharging cargo, loading and coaling. Libelant George Young was in the employ of the Stevedoring Company, and at the time of his injury was acting under the orders and directions of such company. The company completed discharging the ship on the afternoon of the 16th,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and at once began making arrangements for coaling. The coal was to be taken aboard ship from the port side and dumped into the coal bunker hatches on the shelter deck on the starboard side. To get the coal across ship and over the engine house, staging was erected to carry the chutes for transferring the coal. Prior to the erection of the staging, the coverings were removed from the three coal bunker hatches for receiving the coal, but work had to be suspended for the time. The hatches remained uncovered in the meanwhile. The Stevedoring Company had been engaged in fumigating the ship, and for that purpose the main hatches, of which there were five, had been covered. With a view to uncovering these main hatches, the Stevedoring Company sent Young and one Michael Maher aboard ship between 11 and 11:30 p. m., with instructions to do the work. When the coverings had been removed, Young started to leave the ship, and walked into the open No. 3 hatch, and sustained the injuries of which he complains. The negligence relied upon for recovery consists in leaving the hatch uncovered and unguarded and insufficiently lighted for warning against the imminence of danger.

[1] Primarily the ship is bound to turn over to an independent contractor, for discharging and taking on cargo, a vessel in safe condition, and to that extent it must in the first instance furnish the longshoremen and workmen a reasonably safe place in which to perform their work, and when that is done, or it has exercised reasonable care and circumspection in that respect, it has discharged its whole duty to both the contractor and the workmen—

"the rule being that a vessel in charge of stevedores or independent contractors is not liable in admiralty to such stevedores or independent contractors, or to their employees, for injuries, unless a contractual relation exists between the vessel and the person injured, or on account of the failure on the part of the owner, or those in charge of the navigation of the vessel, to perform maritime duty or obligation, as a result of which injuries are received." The Clan Graham (D. C.) 163 Fed. 961, and cases there cited.

The hatches of which complaint is made were properly covered, and were guarded in the usual way for ships of that construction, when the vessel was turned over to the Stevedoring Company. So, also, were the lighting facilities at the command of the contractors sufficient and abundant for protection of the longshoremen. This can hardly be gainsaid under the testimony. Such being the case, the ship cannot be held liable for removal of the hatch coverings, or for leaving the hatches uncovered and unguarded through the fault or neglect of the contractor or its servants and employees, or for having failed to maintain sufficient light to protect libelant, and the libel must be dismissed as to it.

[2] The inquiry now recurs to the controversy between libelant and respondent Griffiths & Sprague Stevedoring Company. This requires a further statement of the facts.

The dimensions of hatch No. 3 were 10 feet 6 inches by 3 feet 11 inches. It was situated some 18 or 20 inches from the rail of the ship, and 7 feet 2 inches from the casing of the engine or deck house, giving a clear passageway of that space between the coaming of the hatch and

the deck house. The coaming about the hatch was slightly more than 3 inches in height. The longshoremen came aboard by means of a ladder extending from the dock to the rail of the ship. The landing aboard was aft, and distant from the hatch from 7 to 11 feet; the witnesses not being in agreement upon the subject.

A light, consisting of what is termed a white glow lamp, was made fast to the foreguy of the ship's davit, aft of hatch No. 3, and suspended some 2 or 3 feet above the deck. At about 8 in the evening the first officer directed the quartermaster to remove the lamp "on the foreside above the trimming hatch corner." This was done, and it was suspended about 2 feet 6 inches above the deck, to the guy rope. The lamp, if in order, displayed a bright light; but the witnesses variously describe it as being "not very clean," "dirty," and "smoky."

There were shore lights on the dock, arranged some 40 feet apart. These lights stood above the deck of the ship, but it is not clear as to their height. They were provided with shades, which, as related by one of the witnesses, cast the light downward upon the dock, and not upon the deck of the ship. Another witness, the customs guard, relates that they threw no light at all on the hatchway, and that the hatches were thrown into a deep shadow by the brightness of the light, on account of the hatch coverings being stood on edge against the railing.

There is a controversy as to what was done with the hatch coverings and as to how they were disposed. The evidence tends, in one phase of it, to show that the covers, with other boards, were placed against the railing abreast of the hatches and the intervening spaces between them all the way along, and, in the other phase, that they were only disposed opposite the spaces between the hatches to prevent the coal from going overboard as it came from the chute. It is difficult to say what the real fact was in this regard. Probably the shield extended more or less abreast of the hatches as well. This lends force to the statement of the customs guard, a wholly disinterested witness, to the effect that there was plenty of light, except where the hatches were; that the trouble was there was too much light, the hatches being cast in the shadow by reason of the disposition of the hatch coverings against the railing of the ship. This is borne out in a measure by the fact that Young and Maher, when they went aboard after 11 o'clock, went about on deck, both port and starboard, removing the coverings from the five main hatches, without extra lighting, except a lantern which the quartermaster had, and of which Maher speaks disparagingly.

After the hatch coverings were removed from the five main hatches by Young and Maher, and when they with the quartermaster were near the fiddley room door, Young remarked to Maher, "Let's go home," and at once walked off towards the ladder, but came too near the hatch and fell in. Young declares he had no knowledge whatever that hatch No. 3 was uncovered, although he went ashore at about 4 o'clock in the afternoon, passing down the ladder, at which time the hatch coverings were standing against the railing, and returned the same way to remove the coverings from the main hatches. Maher went ashore about the same time, and observed, not only that the hatch coverings

were standing against the railing, but that hatch No. 3 was open and unguarded. Others, who went ashore at about the same time or later, observed the same thing.

It is unnecessary to follow the testimony in detail. Enough has been stated to show its dominant tendency. I am persuaded that the Stevedoring Company was negligent in leaving the trimming hatches uncovered and unguarded on the evening of the accident, when it was ascertained that no coal would be delivered for loading until the succeeding day, and that it was further negligent in permitting the lights to be so arranged as to cast a deep shadow over hatch No. 3, and thereby to obscure it appreciably from open view to passers-by. It is more than probable that the customs watch is right about the situation when he relates that the lights, presumably from the dock, were too bright, and that the hatch coverings standing against the ship's rail intervening cast such a shadow as to obscure the hatch opening. Such a situation ought to have been observed and further precaution taken against danger.

On the other hand, I am likewise of the opinion that Young was equally guilty of contributory negligence conducing to his own injury. He must have known, as others knew, that hatch No. 3 was uncovered. He passed off the boat, within but a few feet of the open hatch, when he did not need artificial lighting to advise him of the situation by a casual exercise of his sense of seeing. Further than this, the hatch coverings were standing against the railing at the time, and in such plain view that they could hardly have escaped his observation. The fact that they were in that position gave fair warning, to a man of his experience in the work in which he was engaged, that the trimming hatch coverings were off. When he and Maher had finished their work in uncovering the main hatches, he evidently became anxious to get away, and, saying to Maher, "Let's go home," he hurriedly started to leave the ship, and walked heedlessly into the open hatch. There was a completely open and clear way of 7 feet 2 inches next the engine house, of which he surely had knowledge, and if he had exercised ordinary caution he would have evaded the open hatch.

Both parties to the controversy being at fault, or rather guilty of negligence which conduced to the injury of the libelant, it is proper to divide the damages sustained between them. The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586.

[3] It is suggested that the act of leaving the trimming hatches uncovered and unguarded was an act of a fellow servant, and therefore that the Stevedoring Company would not be liable. This overlooks the rule that the duty of providing a safe place in which the employee is required to do his work is nondelegable in character, and the principal is responsible for the acts of his employee in rendering the place unsafe, whether the employee be a fellow servant or not. The fellow-servant rule is without application in such a case. Nor does the employee assume the risks incident to the negligence of the employer, unless it be that he has ample knowledge of the conditions and continues in his employment fully appreciating the attendant danger.

Libelant suffered severely from the accident, having fallen across a

beam, which resulted in rending his left kidney into two parts and necessitating its removal. Transfusion of blood was resorted to during his treatment. The physician could not say that the removal of the kidney would cause a shortening of his life. Libelant has been unable to do longshoreman's work since. He moves about at will, and is apparently able to do light work. He is now engaged about a cigar stand, poolroom and soft drink parlor, whether as owner or employee does not appear. The physician, while he thought libelant unfit at present to perform manual labor, was uncertain whether he might not recover eventually.

Libelant was of the age of 40 years, with an expectancy of life of 28.18 years. He earned the year previous to the accident $2,300. His hospital and nursing expenditure was $345.85, and his liability to his physician $100. Wages have diminished appreciably since the injury. I estimate that $1,725 per annum would be a reasonable allowance for libelant's loss of time, and I am impressed that $7,500 is a fair allowance for the pain and suffering endured and as compensation for disability. By a careful reckoning, these all amount to $10,935.85, one-half of which is $5,467.92. Libelant's recovery will therefore be in the latter amount against respondent Griffiths & Sprague Stevedoring Company; libelant to bear his own expenses and costs of the suit, and the Stevedoring Company its own costs, together with those of the Kongosan Maru.