## THE LILLIAN.

(District Court, D. Maine, S. D. December 2, 1926.)

### No. 844.

1. **Shipping 84(3)—Injury to longshoreman employed by contracting terminal company in falling from ladder, held due to negligence of company.**

Libelant, a stevedore employed by a terminal company in discharging a cargo of coal, was injured by falling into a hold from a ladder, a rung of which was broken. *Held*, on the evidence, that the ship was in safe condition when delivered to the terminal company; that the rung was broken by being struck by one of the heavy buckets used in discharging, and that the terminal company failed to exercise reasonable care in inspection and to furnish a safe place to work, and was liable for the injury.

2. **Seamen 29(3)—Stevedore employed in discharging ship is "seaman," and fellow servant rule does not apply in suit for his injury (Act June 5, 1920, § 33, amending Act March 4, 1915, § 20 [Comp. St. § 8337a]).**

A stevedore employed in discharging a ship is a "seaman," within the meaning of Act June 5, 1920, § 33, amending Act March 4, 1915, § 20 (Comp. St. § 8337a), and the fellow servant rule does not apply in a suit for his injury.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaman.]

In Admiralty. Suit by Bartley Curran against the steamer Lillian, with the Portland Terminal Company impleaded. Decree for libelant against the Terminal Company alone.

Joseph E. F. Connolly and Harry C. Libby, both of Portland, Me., for libelant.

Nathan W Thompson, of Portland, Me., for the Lillian.

George E. Fogg, of Portland, Me., for Portland Terminal Co.

HALE, District Judge. This libel in admiralty is brought against the steamship Lillian, to recover damages for injuries received on January 8, 1923, by a longshoreman in the employ of the Portland Terminal Company, while acting as a coal trimmer on the ship. The cause of the injury was the fall of Curran into No. 5 hold of the steamship by reason of the breaking of No. 3 rung, or grabiron, of a ladder leading into the hold. The steamship was being discharged by the Portland Terminal Company, at its docks, by means of buckets operated and controlled by the company.

After the suit was brought against the ship, those in charge of her petitioned the court for the Portland Terminal Company to be made a party respondent, under the ad-

miralty rules. The answers of the Portland Terminal Company and the steamship leave Curran to his proof.

[1] The steamship is a large, ocean-going vessel, and at the time of the injury was engaged in carrying coal from Norfolk to Portland. She left Norfolk January 2, 1923, and arrived at Portland January 7th, and shortly thereafter went to the discharging berth of the Portland Terminal Company. She has four cargo holds and one bunker hold. Curran fell into the after hold known as No. 5 hold. Between each of these holds is a steel bulkhead running from the tank tops to the deck. It is impossible to get from one hold to another without going on deck and down the ladder. The rungs, or grabirons, of the ladder are of iron and about a foot apart. It appears that the ship was being discharged in the usual manner by buckets of the terminal company. These buckets are controlled by a man located in a tower about 50 feet above the water; the tower being inboard from the center of the ship more than half the width of the ship. In accordance with the custom, before the trimmers are sent down into the hold to trim the coal into the center of the hatch, where the buckets can get it, the buckets were used to "break down" the hatch; that is, to get together all the coal they can before the services of the trimmers become necessary.

On the part of the ship it is contended that its only duty owed to the libelant was to use reasonable care to turn the ship and her tackle over to the Portland Terminal Company in a sound and seaworthy condition; that the Portland Terminal Company thereafter had the entire control of the discharging of the ship, as an independent contractor; that Curran was in its employ, and had no contractual relations to the ship.

The Portland Terminal Company, on the other hand, urges that, if there was any liability at all, such liability is upon the ship; that the ship was turned over to the Portland Terminal Company in an unseaworthy condition, namely, the rung having been broken before the ship was turned over to the terminal company.

The principal question of fact is whether the ship, at the time she was turned over to the Portland Terminal Company, was in seaworthy condition.

Was the rung broken by the Portland Terminal Company, or before the ship was turned over to that company?

The chief mate, the second mate, and the master of the ship testified that they examined the ship, her ladders, and holds just prior to loading coal at Norfolk on January 2d. The mate says that he personally went up and down the ladder, and that there was no way that the ladder could be injured by coal coming on at Norfolk. On the arrival of the ship at the Portland Terminal Company's docks, she was turned over to the respondent for discharge. The Portland Terminal Company takes the position that she was properly inspected before the work was started; but McIntyre, the superintendent of wharves for the Portland Terminal Company, whose duty it was to see to the discharging of vessels and the handling of the wharves, and to have control of the men, testifies in cross-examination as follows:

"Q. What examination is made of the ship before the work is started? Is there any examination made by the Portland Terminal Company?

"A. Well, not always. Sometimes we make examinations.

"Q. Was there any on this particular occasion, before the men went to work. that day?

"A. No; not to my knowledge; not to my knowledge. No; I didn't make any examination."

The learned counsel for the Portland Terminal Company insists, however, that an examination was made by Green, a foreman, whose general duty is to see to the discharging of ships and to have charge of the stevedores. Green testifies that before the men went down into the hold he made an examination by looking down into the hold, and everything looked all right. He says he did not go up or down the ladder, and did not feel the ladder or test it. His theory is that "there was an old break there, and that the extra weight on it pulled it out."

From the testimony in the case I cannot find that the officers of the Portland Terminal Company exercised reasonable care in making the examination of the ship before the work was started. McIntyre, who had the responsibility in the matter, says that no examination was made, so far as he knows. Green could not, in my opinion, have made a competent examination, for he did not undertake to go up and down the ladder; he simply "looked down into the hold"; whereas, the testimony of those on the part of the ship is that they made a careful examination by going up and down the ladder.

I am constrained to find that those in charge of the ship exercised reasonable care in turning her over to the Portland Terminal Company in a safe and suitable condition for discharge. The proofs show that the heavy

discharging buckets frequently strike and damage the ladders, and there is affirmative testimony that these heavy buckets did strike the ladders while in the possession of the Portland Terminal Company, before the injury. The bent condition of the rung in question indicates that the damage to it was done by some heavy instrument. It appears, also, in testimony that the repairs to the ladder were assumed by the Portland Terminal Company and were actually paid by that company. It is denied in behalf of the Portland Terminal Company that any repairs were done in No. 5 hold; but the whole evidence, including the bill rendered by the people who repaired the ship, induces me to believe that the repairs assumed and paid by the Portland Terminal Company included repairs in No. 5 hold.

[2] The learned proctor for the Portland Terminal Company urges that Curran's own negligence and that of a fellow servant contributed to the injury. He presents a careful and learned argument upon this point, as well as upon other questions of law presented in the case. The question of a fellow servant has been recently before the Supreme Court. I call attention to the recent decision of that court in International Stevedoring Company v. Haverty, 47 S. Ct. 19, 71 L. Ed. ——. In speaking for the court, Judge Holmes held that a longshoreman, injured in the course of employment through negligence of a hatch tender, was entitled to recover, notwithstanding the fellow-servant doctrine, in view of Act June 5, 1920, § 33, amending Act March 4, 1915, § 20 (Comp. St. § 8337a), and that the term "seamen," as used in the above act, includes stevedores, whose work is a maritime service formerly rendered by the ship's crew.

The proofs induce the belief in my mind that the libelant was in the exercise of ordinary care; that, while 14 men made the descent without mishap, he was injured by reason of the breaking of the rung in question. I find no fault on his part.

I have already found that those in control of the ship exercised reasonable care in turning her over to the Portland Terminal Company in safe condition. The ship is, then, held to be free from fault. Clan Graham (D. C.) 163 F. 961, 966; The Auchenarden (D. C.) 100 F. 895; West India & P. S. S. Co., Ltd., v. Weibel, 113 F. 169, 171, 51 C. C. A. 116.

I find the Portland Terminal Company to be at fault in the premises for failing to meet its obligation to exercise reasonable care in furnishing a safe and suitable place for its longshoreman to work while unloading the ship.

The case is referred to Albert B. Hall, Esq., to report damages. Upon the coming in of his report, all matters of cost and all other questions will be presented for determination.