## THE NYHORN.

District Court, E. D. New York.
June 1, 1933.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for claimant.

C. B. Dunham, of New York City (James A. Gray, of Brooklyn, N. Y., of counsel), for libelant.

CAMPBELL, District Judge.

This suit is brought by the libelant, a longshoreman, to recover damages for personal injuries alleged to have been suffered while engaged in the loading of cargo on the steamship Nyhorn.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial, Skibs Atkieselskapet Idaho, the owner of the steamship Nyhorn, was a foreign corporation, duly organized and existing under and by virtue of the laws of Norway, but having no office or place of business within this district or within the jurisdiction of this court.

At all the times hereinafter mentioned, said Skibs Aktieselskapet owned, operated, managed, and controlled the vessel known as the Nyhorn.

At all the times hereinafter mentioned, the libelant was employed by Jules S. Sottneck & Co. in the capacity of a longshoreman, to assist in loading the steamship Nyhorn.

The steamship Nyhorn was a comparatively new Norwegian motorship, having been built at Copenhagen, Denmark, by Burmeister & Wein, whose reputation for building vessels, especially motorships, is of the best. The steamship Nyhorn was completed about the middle of December, 1929, and classed in Lloyds Register.

On the morning of March 11, 1932, the steamship Nyhorn, properly manned and equipped, was docked at Pier 46, Brooklyn, New York Harbor, for the purpose of loading.

Jules S. Sottneck & Co., a competent independent stevedoring contractor, was engaged to load the cargo, and the said Jules S. Sottneck & Co. and its employees, of whom the libelant was one, undertook the loading operation furnishing winchmen and all other necessary employees.

The booms of the Nyhorn, at the request of the stevedores, were rigged so as to permit cargo to be placed at No. 5 hatch from a lighter alongside.

After the booms had been placed in position to the satisfaction of the stevedores, at the request of the stevedores they were furnished by the ship with 10 fathoms of manila rope so that they might, for their own convenience and so that the gangway man could handle manila rope and not have the rough uneven strands of a metal wire cut into his hand, insert a manila runner between the shackle at the end of the wire fall coming through the block at the end of each boom and the hook to which cargo slings were to be attached. One-half of the rope so furnished to the stevedores, 30 feet, was used on each boom, the runner in each instance being doubled, with the result that each manila runner before splicing was 15 feet long, and after splicing it was about 14 feet long.

None of the ship's officers or crew were engaged in the work.

The first draft of cargo consisted of 12 bags of fertilizer, weighing about 200 pounds each, or 2,400 pounds for the whole draft.

When the first draft was ready the signal and warning was given, those engaged in making up the draft, including the libelant, stood clear, and the libelant bent down to make up the second draft.

The first draft of cargo was then hoisted from the deck of the lighter, and the winchman at No. 5 starboard boom, an employee of Jules S. Sottneck & Co., operated the winch at high speed, and in watching the draft did not observe the shackle, with the result that the said shackle connecting the wire fall to the manila runner was caused to strike the block at the end of the boom, sheering off the head of the swivel by which said block was suspended, resulting in the block falling to the deck of the Nyhorn, and the cargo falling back upon the lighter, and part of it upon the libelant, inflicting severe injuries upon him.

The swivel which gave way is stamped as having a lifting strength of 8 tons, but the expert metallurgists put the real lifting strength of a swivel of that size at 50,000 to 80,000 pounds.

The $\frac{3}{4}$ inch wire fall which was used had a lifting strength of 15 to 16 tons.

The 3½ inch manila runner had a lifting strength of 4½ to 5 tons.

The winch was a 3-ton winch.

Following the accident a new block was installed, the manila runner shortened, and the operation of loading continued without any other changes being made in the ship's equipment.

 From the facts as found the steamship Nyhorn was without fault.

There can be no recovery by the libelant in this suit unless it be shown that tackle or equipment, or any part thereof furnished by the vessel to the stevedores, was in some way defective.

The draft which fell weighed but about 2,400 pounds, and all of the tackle and equipment used had a lifting strength far beyond that.

Complaint is made only of the swivel and block.

If we are to believe libelant's witnesses, nothing unusual occurred, and this swivel, 1⅛ inches in diameter, simply parted when lifting a little over one-eighth of the weight for which it had been intended to be used, and for which weight it had been tested and guaranteed.

I do not believe this; not that I think they are intentionally misstating the facts, but that in the performance of an operation so familiar to them, they were not observing what took place at the block, but were devoting whatever attention they were giving to the operation of the draft itself, and that in the quick upward movement of the draft, the first unusual occurrence they observed was when the draft dropped.

The five following reasons are given by libelant's witnesses for the fracture, and I will consider each as stated.

First, lack of oil, grease, or graphite on the swivel. This was not sustained. The swivel must have been oiled or greased during the two and a quarter years the vessel was operating prior to the accident, or considerable wear would have been shown on the nut upon which the block rested, and this was not the case.

I can see no reason to disbelieve the testimony of the mate of the Nyhorn, that one month before the accident on the trip over from Norway the blocks were taken down and oiled, and that the gear and equipment had been used thereafter at Norfolk and Deep River Point.

From the testimony of Captain Lynner, claimant's witness, and German, libelant's witness, and what I observed with reference to both parts of the swivel, Exhibits A–1 and A–2, it is evident that the swivel was oiled or greased.

Even if the swivel had not been lately oiled or greased, I am convinced that it would not have given way in lifting 2,400 pounds, except as the result of some unusual happening, particularly in view of the very slight evidence of wear on the nut upon which the weight of the block rested.

My opinion is further supported by the amount of oil and grease which was on the block when it was opened in court.

Second, that the nut was riveted or peened on the swivel.

While a lock nut or a cotter pin might have been used, the use of the latter would have required a hole in the pin, which to some degree would have weakened it.

The holding of nuts in place by riveting or peening was not uncommon, and by some is thought to be the best way. It was undoubtedly sufficient for the purpose for which it was designed to be used, and the steamship Nyhorn cannot be condemned for using that method.

Whatever may have been the advantage of not peening the nut if you desired to remove it, I do not see how peening or riveting the nut played any part in the accident, as the fracture took place above the nut, and nothing whatever happened to the nut or to the riveting or peening.

Third, the fracture took place in one of the threads of the pin.

That states a fact, and it is true that threading weakened the metal to some extent at that particular point; but even so, the swivel had ample strength to lift an 8-ton weight, and certainly but for some unusual happening, such as a blow causing a torsion of the neck of the swivel, it would have lifted a weight only slightly in excess of a ton. The stevedores were operating the tackle and equipment, and a blow from the shackle, between the wire fall and the manila runner on the block, would have been a competent producing cause of the accident.

In speaking of "shackle," it must be remembered that two have been mentioned, one of which shackled the pin and thereby the block which it sustained to the end of the boom, which is not the one which claimant contends caused the accident as it was above and did not strike the block; the other, which is the one claimed by claimant to have caused the accident, was the one between the

wire fall and the manila runner, and this shackle, if the runner was too long, would be carried up into the block and cause a sudden jolt and shock.

Fourth, that there was a fracture in the pin or bolt before the accident.

The winchman, an employee of the stevedores, whose failure to prevent the shackle hitting the block caused the accident, is the only fact witness called by libelant to sustain this contention, and did not, as I view his testimony, have the opportunity to observe rust on a fracture if there had been one, as he says that the mate was very careful not to let him examine the swivel, and that he never had Exhibits A-1 or A-2 in his hands.

Both Captain Lynner and Captain Kain, who examined those exhibits a short time after the accident, testified that the metal on both sides of the fracture was bright, which would not have been the case if there had been a fracture in the pin before the accident.

These men had charge of these exhibits with ample opportunity for observation, and their testimony is entitled to greater weight than that of the winchman who I believe is in error.

Of necessity there is some dirt and rust at this time on the face of the one and only fracture.

The libelant's metallurgist expert testified that in his opinion, if the pin broke with approximately 2,000 or 3,000 pounds on it, there were two causes for it, one of which was that it had originally a flaw in it, but he did not definitely say he believed there was a flaw.

The claimant's metallurgist expert found no evidence of a flaw in the pin, and this is supported by the evidence of those who examined both portions of the pin shortly after the accident.

Fifth, that the break was due to fatigue of the steel caused by vibration under strain.

This was advanced by the libelant's metallurgist expert, as the other of the two causes either of which could have caused the breaking of the pin. This it appears was in his opinion the cause.

A careful examination of his testimony and that of the metallurgist expert for claimant leads me to the conclusion that the strength of the pin could have been reduced by fatigue cracking, and that the evidence of fatigue cracking, had there been any, could not have been removed, but that there was no evidence of fatigue in the fracture of the pin in question, and therefore the fracture cannot be accounted for by fatigue of the steel, but is clearly a shock fracture.

The complaint as to the block is based on the testimony of libelant's witnesses as to what they found on an examination of the block, made on the Saturday before the trial.

The block was not at the time of the trial or of that examination in proper shape, in view of the damage which it must have received and did receive when it fell from the end of the boom to the deck of the Nyhorn, and the dust and dirt which had accumulated on it from the time of the accident to the time of such examination due to lack of care.

The mate's testimony as to the oiling and greasing, and the testimony of Captain Lynner as to what he found on his examination on the day of the accident, show that the block had been properly cared for, and this was corroborated by the appearance of the block when it was opened up.

The block certainly showed evidence of having been damaged in falling to the deck, but in addition to that the block showed evidence of the cause of the accident to which none of libelant's witnesses referred, in that the bolt holding the two sides of the block together was bent and split, when examined by Captain Lynner on the day of the accident, and seen by the mate to have been bent, and was at the place in the block where the shackle hit and caused the torsion shock which caused the swivel to give way.

The libelant offered evidence as to the care by others of this character of ship's gear.

The testimony of Captain O'Neill as to his custom with reference to the examination and overhauling of such gear, having it annealed annually, does not prove any such general custom, as there was no evidence that it was done by other companies, and it was not even shown that such was the custom of his predecessor or his successor as port superintendent of the Munson Line.

The common practice is while the ship is at sea on each voyage, to take the discharging gear down, look over the blocks, oil them, and put them back again. If they find anything wrong they take it down and on arrival send it ashore to have it repaired.

This was done on the Nyhorn on the way from Norway to Brooklyn prior to the loading in question, when all blocks were taken on deck, looked over, oiled up and seen to be in good order before they were put back.

Having considered the various contentions

of libelant's witnesses, it seems to me that there is no necessity for speculation, as I believe the testimony of the claimant's witnesses Fredheim, the ship's carpenter, and Thorsen, the seaman apprentice, that they saw the winch started, and the shackle between the wire fall and the manila runner go up rapidly and strike the block, and as Thorsen said, go in the block and the block come down.

This is a perfectly simple and believable explanation and is corroborated by the physical facts.

The bolt holding the two faces of the block together was bent and split, as it would be if struck by the shackle, as Fredheim and Thorsen testified.

The block which weighs close to 100 pounds hung clear of the ship's side but landed well inside the rail on the deck of the Nyhorn, which shows that the winch was still running when the shackle struck the block and was thrown over toward the winch.

This would not have happened if, as testified by libelant's witnesses, the block had broken with the draft hanging idle over the side of the ship, as the block in that case would have fallen with the draft on the lighter.

Further, I am convinced that the fracture was a shock fracture, caused by a blow of somewhat of a transverse nature, and that is the character of the blow struck by the shackle at the block.

After the accident the runner was shortened so that the shackle could not reach the block.

The said steamship Nyhorn was in all respects seaworthy and properly manned and equipped, and the accident was not caused by any fault or defect in the equipment or by the negligent act of the steamship Nyhorn, or any one for whose actions she was responsible.

Ordinary admiralty principles apply. Plamals v. The Pinar Del Rio, 277 U. S. 151, 48 S. Ct. 457, 72 L. Ed. 827.

It is undoubtedly the duty of the vessel to furnish the stevedores a safe place in which to work and safe appliances to work with, and if that duty has been properly discharged the ship is no longer liable, and in this instance both the block and pin were in good condition and capable of performing the work for which they were designed, but the block was not designed to have a shackle run through it, nor the pin to sustain it under such usage, and the ship is without fault.

The Pacific (D. C.) 23 F.(2d) 218, Jensen v. Bank Line (C. C. A.) 26 F.(2d) 173, and the following cases cited by the libelant, Grays Harbor Stevedore Co. v. Fountain (C. C. A.) 5 F.(2d) 385; Aurigemma v. Nippon Yusen Kaisha Co., 238 N. Y. 183, 187, 144 N. E. 495; Albano v. Mediterranean Stevedoring Co., 211 App. Div. 121, 124, 207 N. Y. S. 12; The Rheola (C. C.) 19 F. 926; Pettengill v. Wm. Porter & Son, 219 Mass. 347, 349, 107 N. E. 269, do not lay down a different rule.

The facts in The Navarino (D. C.) 7 F. (2d) 743, distinguish it from the instant suit.

The accident was caused by those in the employ of the stevedores who determined the length of the manila runner, which was too long, and by the failure of the winchman in the employ of the stevedores, who failed to watch the shackle between the wire fall and the runner and allowed the shackle to come violently into contact with the block, causing the pin to fracture, and the steamship Nyhorn is not liable for any injury to libelant due to the negligence of the employees of the stevedoring company. The Clan Graham (D. C.) 163 F. 961; The Montcalm (D. C.) 249 F. 760; Atlantic Transport Co. v. State of Maryland (C. C. A.) 259 F. 23; The St. Gothard (C. C. A.) 153 F. 855; The Lillian (D. C.) 16 F.(2d) 146.

Inasmuch as the steamship Nyhorn is not liable for the injuries to the libelant, it is not necessary in this action to consider the extent of such injuries.

I find as conclusions of law:

That the steamship Nyhorn was in all respects seaworthy and properly manned and equipped, and that the libelant has failed to prove by a fair preponderance of the evidence that the steamship Nyhorn, or any one for whose actions she is responsible, in any way negligently caused or contributed to the damages to the libelant, and that the steamship Nyhorn is wholly without fault.

That the claimant is entitled to a decree against the libelant dismissing the libel, with costs.

That a decree may be entered in accordance herewith. Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty, proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.