## THE MARTHA E. WALLACE.

(District Court, S. D. New York. February 5, 1907.)

1. SHIPPING—LIABILITY OF VESSEL FOR PERSONAL INJURY—HATCHWAY COVERED BY TARPAULIN.

A schooner *held* liable for the injury of the master of a tug who was directing the movements of his own and another tug engaged to move the schooner to another pier, and who, while engaged in such duties and when on the deck of the schooner, stepped upon a hatchway covered by a tarpaulin, which had the appearance of being drawn over the covers, when, in fact, they were not on, nor was the tarpaulin sufficiently secured to hold libelant's weight and he fell through into the hold, receiving serious injuries.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 335.]

Alexander & Ash, for libellant.

Carl S. Petrasch, for claimant.

ADAMS, District Judge. This action arose out of personal injuries suffered by Olaf K. Knudsen by falling through a hatchway, covered by a tarpaulin, in the deck of the schooner Martha E. Wallace, lying at Hoboken, New Jersey, on the 16th day of February, 1904, between 7 and 8 o'clock in the morning. The schooner was at pier No. 3, and desiring to be transferred to pier No. 4, next below, engaged the steam tugs Nettie L. Tice and Edgett to perform the service. The plaintiff was the master of the Tice and went aboard the schooner to superintend the movements of both tugs. While directing their actions, he stepped from some ties on the port side, upon a tarpaulin covering the after hatchway, which gave way and he received the injuries for which he here seeks to recover damages.

The Tice was at the time fastened to the starboard side of the schooner near the stem and the Edgett was near the stern fastened with a hawser and two lines. The schooner was higher in the water than the tugs, the bulwarks at the bow being about on a level with the lower house of the Tice and the stern was 4 or 5 feet higher than the pilot house of the Edgett. The tide at the time was ebb and the wind blowing a northwesterly gale of about 67 miles in velocity. There had been a snow storm, with short breaks, from 8 o'clock in the morning of the 14th until 3 o'clock in the morning of the 15th, and some of the snow was scattered around the deck and on the deck load of railroad ties. There were also ties under the deck and this hatch had been opened for the purpose of discharging them. It was ordinarily protected by six hatch covers, three on a side, running athwartship, supported by three strong backs, running fore and aft. The covers when they were on would be about two feet above the deck. Then there was a tarpaulin, made of strong canvas, covering the whole opening. While unloading, the hatch covers and tarpaulin were off. The cargo had been taken out of this hatch in the square of the hatch. The mate, who was in charge of the schooner, said there were two strong backs extending from the hatch coamings to the bars and then the tarpaulin went over all and was fastened down with eye bolts all around, forty-eight in all. He also said that the evening before this accident, about half past five o'clock,

151 F.—23

with the help of the stevedores, he put on the tarpaulin which in the morning presented a sagged appearance, although it was fastened with an eye bolt at each corner. The libellant on the contrary said it was taut.

It appears that when they attempted to tow the schooner, one of the lines by which she was fastened to the wharf forward was frozen fast, or had become jammed, so that the movement of the vessel was interfered with and it became necessary for the libellant to reach the place quickly, as he could not see much from where he was, and attempted to walk across the forward end of the after hatch on the port side. The tarpaulin then gave way under his feet and he was precipitated into the hold, falling sixteen feet, striking the ties in the hold and receiving serious injuries. He said that this hatch was apparently covered the same as when a vessel is going to sea and there was nothing to apprise him of any danger in stepping on it.

On the other hand, the claimant contends that the condition of the hatchway and of the tarpaulin was sufficient to advise him that the covers were not on; that on the top of the tarpaulin were placed three or four boards in a diagonal way to keep the tarpaulin from blowing up and the tarpaulin was in a condition of sagging down, which indicated that the covers were not on because then the tarpaulin looks level to the eye.

It is shown by the claimant's mate, however, that though loose at the sides and ends the tarpaulin, specially made to fit the hatch, was fastened at the corners, which must necessarily have given it a level appearance and any reasonably prudent acting man might justly conclude that the hatch was covered and the tarpaulin properly secured.

On cross examination, the mate said that when the libelant asked him, a little time after the accident, why he did not have his hatches on, he replied: "I told him it was the stevedore's place to put them on". There can be no doubt that the libellant acted upon the supposition that they were on and stepped upon the tarpaulin in full faith that his weight would be sustained. It was necessary for him to get aft quickly, because one of the lines there was frozen fast and prevented a proper movement on the part of the Edgett. This required the libellant's attention and he naturally took the most direct way of reaching the place he had to go to. The tarpaulin did not, however, sustain him, hence the fall into the hatch, which I conclude the vessel is answerable for, otherwise the schooner would be justified in maintaining a trap, into which persons rightfully on the vessel would be liable to fall. It is not as if the libellant had walked into an open hatch, or on a place which was manifestly not strong enough to sustain him. If this tarpaulin had been fastened properly, as it appeared to be, it would have sustained the libellant, at least the mate of the vessel testified that it would sustain a man.

There remains the question of the amount of damages which the libellant is entitled to recover. He claims that the fall rendered him unconscious and that he received such injuries that he will be permanently disabled in a private way. There is considerable conflict in the evidence upon these points, a full discussion of which does not seem neces-

sary. I have no doubt that the libellant has suffered much pain, besides incurring large expenses for medical attendance. The pain was incident to bruises he received in the fall on the right side, on his face, including a broken nose, the loss of six teeth and a severe and probably permanent attack of neurasthenia, which seems to have yielded to a large extent to treatment, but it is credibly testified that where a person once receives an injury of his kind, he is much more susceptible than before to the same trouble. He will doubtless require further medical attendance. He has lost about 23 pounds in weight, probably due to the accident, and the suffering from it. While he is able to perform his duties as a tug boat master on a larger boat, at a somewhat higher salary than before, he becomes nervous in performing his duties, and is obliged to wear surgical appliances to enable him to stand.

Without going into further details, it is sufficient to say I think that $2,000 will be a fair sum to award the libellant, besides the expenses he has incurred, his loss of time and board, testified to as follows: Physician's services $800.; loss of wages while actually incapacitated for work, amounting to $275. (10 weeks at $110 per month) and board while off the boat, where he received it as part of his compensation, $154· (77 days at $2. each). If the claimant desires, a reference may be had to determine the amount of the physician's bill, the board and wages items.