THE CLAN GRAHAM et al.

(District Court, D. Oregon. September 2, 1908.)

No. 4,817.

1. SHIPPING—INJURY OF STEVEDORE—LIABILITY OF VESSEL.

A ship with an open between-decks having transverse beams across was under no duty to stevedores or others working about the vessel to lay a decking upon such beams nor was it negligence to permit dunnage, consisting of loose timbers and planks to be temporarily stowed on the beams while preparing the vessel for loading which would render her liable for the injury of a stevedore by stepping upon the end of one of such loose planks which tipped with his weight and allowed him to fall into the hold, where the presence of the dunnage was apparent, and it did not have the appearance of a permanent decking.

**2. SAME—EMPLOYÉ OF INDEPENDENT CONTRACTORS.**

When a vessel has employed independent contractors to load and stow the cargo and has turned the vessel over to them in a safe condition, she is relieved from liability for an injury to an employé of the stevedores arising from a danger created by the manner in which they did the work.

**3. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE OF FELLOW SERVANT.**

A firm of stevedores loading a ship by contract which furnished its employés with candles to be used in their work as in their own judgment they might be required cannot be held liable for the injury of an employé alleged to have been caused by insufficient light in the place where he was working, and which had been lighted by a fellow servant.

In Admiralty.

See 153 Fed. 977.

Giltner & Sewall and William La Force, for libelant.

Williams, Wood & Linthicum and Gammans & Malarkey, for The Clan Graham.

Wm. D. Fenton and A. M. Dibble, for Brown & McCabe.

WOLVERTON, District Judge. This is a libel for the recovery of damages arising from injury to the person of the libelant. The respondents Brown & McCabe, who were stevedores, were under contract with the respondent Clan Graham to load her with wheat. The libelant was a longshoreman, and in the employ of Brown & McCabe to assist in loading. It is averred that the Clan Graham was an open ship between decks, with iron cross-beams running from one side to the other; that said cross-beams were partly covered over with between-deck hatches or planks, which made it appear safe 'for persons walking thereon; that libelant while proceeding along between decks at about 7:30 o'clock on the morning of December 28, 1905, fell through an opening contiguous to the forward hatchway to the hold below, whereby he was injured; that, the morning being dark, the libelees failed and neglected to provide sufficient light to light up the between-decks, and carelessly and negligently failed to cover said opening, or to notify libelant thereof, or to provide a safe place for libelant to walk over in order to do his work in loading the vessel. Besides a denial of the material charges of the libel, the Clan Graham avers that Brown & McCabe were independent contractors for the loading of the vessel, and that, if any liability was incurred, it was by them, and not by the vessel, and, further, that the libelant was himself negligent contributing to his injury. Brown & McCabe plead contributory negligence and assumption of the risk incurred by libelant's employment.

By the evidence it appears that the Clan Graham is an open between-decks vessel, being constructed with beams running across ship, from one side to the other, except where hatchways intersect them, in which event the beams extend from the side of the ship to the hatchway: These beams are placed four feet apart, and have a top surface of eight inches, upon which the men walk from side to side of the ship when necessary. Four longitudinal girders extend fore and aft—one along each side of the vessel, and one upon each side of the hatchways. The forward hatchway is 12 or 14 feet in width, and the central gird-

ers run close alongside of it. The side plates or girders are three feet in width on the top, and the central girders two feet in width. Other plates run diagonally across, but it is unnecessary to describe these further. Forward of the forward hatch the beams are decked over with permanent decking bolted to them. The space between the girders abreast the forward hatch on either side is left entirely open and without decking in the ship's primary construction. On the morning of the accident Rosh, a co-servant of the libelant, preceded libelant down the hatchway, taking with him some candles handed him by Fred Jorgenson, the foreman of Brown & McCabe. Rosh lighted one of the candles, and placed it on some dunnage lying on the permanent deck, and gave the others to another workman, who went below in the hold. Libelant came down on the between-deck, and he says that he walked across from forward of the hatch into the starboard wing of the ship, reaching a point nearly opposite the center of the hatch, and there hung up his coat, and made his way back again to near the forward end of the hatch. He then went to the after part of the hatch, where workmen were putting up a spar, and helped them to pull up and tighten a rope. Some one having given the order, he left the starboard side of the hatch, near the corner aft, to go again into the wing, but forward, for a spar, and, when he had gone a little way only, he stepped on a board or plank, which tipped with his weight and let him through the deck into the hold below, causing a fracture of his leg, and other injuries. The men about the hatch at the time were engaged in arranging a chute for conducting sacked wheat into the hold to be loaded. Libelant says he had gone three or four feet when the plank tipped with him, and locates the opening through which he fell starboard and opposite near the center of the hatch. Other witnesses who saw the opening from below after the accident locate it about the same place. The lighted candle was placed on the pieces of dunnage about 4 feet forward of the hatch, and near midway between the hatch and side of the ship; thus fixing its location from 12 to 14 feet almost directly forward of the place through which libelant fell. Libelant further testifies that the decking looked to be solid; that the between-decks had the appearance of being a closed hatch ship clear back flush with the hatch; and that he did not know that the ship was open deck around the hatches, otherwise, he was apprised that the beams were open abaft the hatch. There was solid footing around the hatch on the sides and aft for the width and space of 18 inches to 2 feet.

Kerns, a witness for the libelant, testifies that there was a floor of planks extending from the side of the hatch into the starboard wing, but that there was dunnage in the wing also; that later, in the progress of loading the ship, these planks and dunnage were all removed; and that the men worked right up through between the beams. Albert Rosh relates that he lit the candle and put it on the dunnage; that there was a good deal of dunnage in the wing of the ship, and for this he could not tell whether the ship was open deck or not; that the solid deck extended back to the forward end of the hatch, and because of the dunnage he could not tell whether it extended farther or not. He further relates that the dunnage, consisting of sticks of lumber and

timber of every description, was lying in all directions, criss-cross and otherwise, "was strewed all over pretty nearly from the hatch-coaming of the ship up towards the wing, made one pile." After lighting the candle, and placing it in position on the dunnage, witness went into the wing of the ship, walking along to the starboard, but forward of the hatch, and deposited his coat and hat there, and returned to the hatchway. In making his way over and back he stepped over planking, boards, and other dunnage. Other witnesses have testified relative to the decking and the appearance about the hatchway, but this statement will suffice to elucidate the situation very clearly, and in one aspect of the case it only remains to apply the law for a determination of the controversy.

The negligence complained of is in not providing the libelant with a safe place upon which to walk in doing his work, in leaving an opening in the decks uncovered, and in failing to properly light the between-decks, or to notify the libelant of such opening. It has been suggested that there is a variance between the allegations of the libel relative to the opening, and the proofs, for that the proofs show that no opening existed, but that libelant stepped on the end of a plank, which tipped up with him, and let him through the deck. If, however, there is any variance, I am disposed to treat it as immaterial, and to decide the case wholly upon its merits. In order for the libelant to succeed on this phase of the controversy, it is necessary for him to establish some duty which the respondent owed him, and a neglect of that duty to the libelant's detriment. The ship being of open between-decks construction, certainly respondent did not owe to the libelant the duty of laying down solid decking between the hatchway and the wing. It owed no one such duty. Longshoremen know very well what it is to work in an open between-decks ship, and they do not expect or require further protection under foot than is ordinarily to be found in a ship of that construction. So that I say it was not incumbent upon the Clan Graham, as a duty owing to the libelant, to lay a decking between the hatch and the wing abaft the front end of the hatch. Libelant contends, notwithstanding, that planking was laid between the hatch and the wing, so as to give it the appearance of a solid or usual decking, and the libelant was misled into the use of it; that, having so covered the beams, it was negligence to leave the opening. Allowing that the allegations of negligence are resolvable into this form, they are not sustained by the preponderance of the evidence. The Clan Graham would not be permitted to lay a trap for workmen about its decks by giving that the semblance of decking which in reality was not, and, having misled the workmen, repudiate liability; but it is quite probable that no attempt was ever made to plank the beams over in the space designated, except in a temporary way to permit of its use in stowing dunnage for the time being. There is always more or less dunnage about a ship of that kind, and in cleaning out her hold for receiving cargo the dunnage is casually stowed away, and shifted from place to place, until its further use is required. On this occasion a good deal of dunnage was stowed in that wing of the vessel. Rosh found it there, placed his candle upon a piece of it, and stepped over other pieces in walking to the wing of the ship to deposit his coat and

hat, and back again to the side of the hatch. It will be noted that Rosh walked on the solid permanent decking, which extended back flush with the forward end of the hatch; and I am inclined to think that libelant took almost the same course when he deposited his coat in the wing. He must have encountered dunnage then, and was fully aware of its presence. When, however, he started to get the spar, he stepped off on the loose planking, which in itself was dunnage, and lost his balance, and went down. There was no occasion, I am impressed, for any one mis'nking the temporary planking for solid decking extending back to that point; and, when the libelant stepped out in that direction, he went with full knowledge that he was passing over dunnage stowed upon the beams of the ship. There was, therefore, no duty neglected on the part of the Clan Graham in not providing solid flooring at the place where the libelant fell through; nor did she mislead the libelant into a dangerous place by providing a decking of the semblance of the permanent deck further forward. Hence the respondent is not chargeable with negligence in leaving the opening complained of, or the particular plank in a condition that it tipped up with the weight of the libelant when he stepped upon it.

The foregoing conclusion is supported by the case of The Hadjc (C. C.) 50 Fed. 225, where it was held that it was not negligence to allow the between-deck beams of the vessel to be uncovered by a deck, or to use such beams for the stowage of loose planks for a temporary purpose, or to leave the ends of loose deals unsupported at the place where the libelant fell, that the deals were not so placed as to justify libelant in believing that he was proceeding upon a deck, and that the libelant used the deals for a purpose for which they were not intended, without necessity, and with fair notice, from the manner in which they lay, that they were not intended to be so used. In its main features the conclusion is supported, also, by The Gladiolus (C. C.) 22 Fed. 454. As has been indicated, the ship Clan Graham was not in duty bound to cover the beams in the between-decks opposite the forward hatch. The deck was not so covered in its original construction, and the libelant was undoubtedly aware that the vessel was open between decks. He must have known, also, that that particular space was then being used for the temporary stowage of dunnage, and, before walking off in that direction, he should have used greater precaution. At any rate, the ship has not been derelict in any duty that it owed the libelant, and hence is not liable on account of the beams being undecked or loosely covered with dunnage.

Now, as to the other features of the controversy, namely, the alleged neglect in furnishing the lighting, and failure to properly light the surroundings so that libelant could safely go about his work. The men about the hatch were at the time libelant was hurt engaged in putting a chute in place, running down the hatchway, for conducting wheat in sacks into the hold of the ship, and libelant was one of the men engaged in that particular service. The work was of a temporary nature only, and, when completed, the men were to go below and assist in stowing the cargo, with the exception of one, who would be stationed in the hatchway to attend to shifting the sacks as they came down, so as to

pass them on below. Rosh was a co-laborer with the libelant, and the lighting between decks was a matter which he assumed to attend to. He was handed more candles than he used in that locality, sending all but one of them below. Thus he passed judgment upon the amount of light necessary for doing the temporary work at the hatch. Furthermore, he attended to placing the light, and presumably considered it advantageously placed, and possessing power to sufficiently light up the surroundings for doing the temporary work in hand. It was a matter of his judgment, and not of that of Brown & McCabe, or of their foreman. The custom had been on occasions when lights were needed for the foreman to furnish the men with candles. They could take as many as they deemed sufficient to light the surroundings wherein they were called upon to do work, and it was left entirely to their judgment how the candles were to be placed so that they would shed the necessary light for their convenience and safety. There was therefore no duty in the premises cast upon Brown & McCabe to light the surroundings for their workmen in the hold of the ship. It was only incumbent upon them to have at hand sufficient candles to light the ship where needed, so that the workmen at their will could get them, and as many as their judgment suggested were necessary for their convenience and safety. This Brown & McCabe did, and Rosh took all the candles that he deemed needful, and evidently used what he thought would properly light the between-decks for the temporary purposes desired. If there was fault in his judgment, Brown & McCabe were not responsible for it. In that particular work Rosh was a co-servant with the libelant, and the fellow-servant doctrine, whereby the master is not liable for the negligent acts of one fellow servant conducing to the injury of another, applies. So, therefore, Brown & McCabe were not rendered liable for not properly lighting the between-decks.

Furthermore, under the evidence, it clearly appears that Brown & McCabe were independent contractors with the Clan Graham for loading the vessel. Hence the Clan Graham was also not responsible for insufficient lighting of the between-decks, and incurred no liability by reason of the casualty. It has been determined that the vessel in the first instance is required to furnish a safe place in which the workmen are required to perform their services, and a reasonably safe passageway to and from such place, but, when it has employed an independent contractor to load and stow the cargo, and has turned the ship over to the contractor in a safe condition, then it is relieved of any fault that may arise through the work of the servants of the contractor; the rule being that a vessel in charge of stevedores or independent contractors is not liable in admiralty to such stevedores or independent contractors, or to their employés, for injuries, unless a contractual relation exists between the vessel and the person injured, or on account of the failure on the part of the owner, or those in charge of the navigation of the vessel, to perform maritime duty or obligation, as a result of which injuries are received. The Saranac (D. C.) 132 Fed. 936. To the same purpose, see The Auchenarden (D. C.) 100 Fed. 895, and The Thyra (D. C.) 114 Fed. 978. See, also, The William F. Babcock (D. C.) 31 Fed. 418; The Theresina (D. C.)

31 Fed. 90; The Argonaut (D. C.) 61 Fed. 517; The Louisiana, 74 Fed. 748, 21 C. C. A. 60.

These considerations lead to a dismissal of the libel, and such will be the order of the court.