## GRILLO v. UNITED STATES.
### No. 57, Docket 21423.

United States Court of Appeals
Second Circuit.

Argued Nov. 3, 1949.

Decided Nov. 29, 1949.

David M. Fink and Jacquin Frank, New York City, Proctors for appellant; Jacquin Frank, New York City, Advocate.

John F. X. McGohey, United States Attorney, New York City, Proctor for appellee; Hunt, Hill & Betts, New York City, and George S. Bernhard, New York City, of counsel; William Logan, Jr., New York City, Advocate.

Before L. HAND, SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

Angelo Grillo, a foreman stevedore employed by Carter & Weekes, brought suit against the United States, owner of the S.S. Charles H. Windham, to recover damages for personal injuries sustained by him on September 20, 1945 when he fell from No. 2 hatch to the 'tween deck while he and his

fellow stevedores were engaged in work preparatory to unloading sand ballast from No. 2 hold. Upon the trial he contended, as he still does, that when he stepped upon the fourth cover board from the starboard side of the second section of the hatch, the board gave way because it had not been properly placed on the cross-beams when the ship left Antwerp, and consequently she arrived in New York in an unseaworthy condition. The district judge made findings of fact adverse to the libellant and he has appealed. The appeal questions only the correctness of the court's findings.

The No. 2 hatch is approximately 35 feet fore and aft and 20 feet athwartships. It is divided by cross-beams into seven sections, the first section being the space between the forward coaming and the first cross-beam, the second section being the space between the first and second cross-beams, and so on seriatim. Each section is covered by wooden hatch covers, each cover board being approximately 60 inches in length, 20 to 30 inches in width, and 2½ inches thick. The cross-beams have a vertical flange 2½ inches high and on each side of the flange a lip or shelf, 3¾ inches wide, upon which the ends of the cover boards rest when the hatch is covered. The theory of the appellant is that the forward end of the cover board which gave way and fell with him to the 'tween deck rested on the vertical flange of the first cross-beam because a bend aft of this beam shortened the space between the first and second beams and made it impossible to set the cover board upon the shelf of the first beam so that it would lie flush with the other covers. Grillo himself did not know what caused the board to give way; he did not see it resting upon the flange. Nor did any other witness see the board which fell with Grillo. Hendrix testified that after Grillo's fall he noticed that the first beam had a bend aft and that several cover boards in the second section were resting upon the flange of the first beam. But he had previously signed a written statement that the cover boards rested upon the flange of the second beam and that this was bent forward, not that the first beam was bent aft. This contradictory version surely permitted the trial judge to discredit, as he did, Hendrix's testimony. Small, on cross-examination, made the extravagant statement that the first beam was bent aft two or three inches and three or four covers in the middle rested on the flange. Porter saw a "belly" in the beam but saw no raised cover boards. He did not know which section of the hatch the libellant fell through, but was "quite sure" it was the third section on the port side. The testimony of the libellant's witnesses was far from convincing that there was any bend sufficient to require a cover board to rest on the flange of the first beam. It was contradicted by the photographs and by the testimony of Lynner, who examined the vessel a few days after the accident, as well as by witnesses for the respondant who testified by deposition. They had either seen the covers in place at Antwerp or the tarpaulins lying flat over the hatch during the voyage. If any cover board was resting on the flange the tarpaulins could not have been stretched flat; there would have been a 2½ inch hump where the board rested. That would have created a serious danger if rough weather were encountered. Not only is it improbable that the ship would set out on her voyage so fitted out, but all her witnesses testified that there was no hump in the tarpaulins. Since she arrived in New York with the tarpaulins still battened down, it is a necessary inference that whatever was her condition at Antwerp was her condition when the stevedores took over. Finally, it is plainly within the realm of possibilities that the stevedores who rolled off the tarpaulins immediately began to lift the covers, even though this was not their usual practice. It is true that the libellant's witnesses testified that the stevedores had not disturbed the hatch covers after the tarpaulins were removed, but since there were 14 or 15 of the gang who might have moved them and were not called as witnesses, the negative testimony of the few who were called and whose duties did not involve removal of the covers, did not compel acceptance of their testimony.

The libellant had the burden of proving that the ship was not seaworthy; the evidence of his witnesses on that sub-

ject was discredited by the trial judge, and was flatly contradicted by the respondent's witnesses. On this record we cannot say the findings of fact were "clearly erroneous"; indeed, we think them correct.

Decree affirmed.