**Abdul SAMAD, Libellant,**

v.

**THE Steamship ETIVEBANK, her engines, boats, tackle, etc., in rem, and Andrew Wier Shipping and Trading Company, Ltd. (The BANK LINE, LTD.), a foreign corporation or association, as owners and/or operators of said vessel, in personam, Respondents.**

**No. 7676.**

United States District Court
E. D. Virginia, Norfolk Division.

Sept. 29, 1955.

532

Sidney H. Kelsey, Norfolk, Va., for libellant.

Seawell, Johnston, McCoy & Winston, Leon T. Seawell, Jr., & Harry E. McCoy, Jr., Norfolk, Va., for respondents.

HOFFMAN, District Judge.

Abdul Samad, a citizen of Pakistan, signed aboard the British s/s Etivebank at Calcutta, India, on March 5, 1953. Returning to that port after a six months voyage, he re-signed aboard the same vessel at Calcutta on October 1, 1953, as a "lascar" (referred to as a "sailor", the equivalent of an "ordinary seaman") for a term of twelve months at wages of 125 Rupees per month (equivalent of $38 American money). The agreement, printed in English, was signed by Samad and most of the other lascars through the process of affixing their thumb prints; the thumb print appearing on the left margin of the agreement.

It will be noted that the crew, the vast majority of whom were citizens of Pakistan and unable to read or write, were aboard a vessel flying the flag of Great Britain. The libellant's injuries, admittedly serious and permanent, were sustained aboard the ship while the same was undergoing repairs at the Newport News Shipbuilding and Drydock Corporation, Newport News, Virginia.

The agreement, executed in India, provided in part as follows:

"It is further agreed that, in the event of any of the said crew, whose name is hereto subscribed sustaining any personal injury (including injury resulting in death) by accident arising out of and in the course of his employment under this agreement when the ship is not in the Dominion of India, the owner of the ship shall pay such amount of compensation as he would have been liable to pay under the Workmen's Compensation Act, 1923, being Act No. VIII of 1923 of the Indian Legislature, as amended from time to time if the accident had occurred within the Dominion of India and it is further agreed that in the event of any question arising under these stipulations as to the liability of the owner to pay compensation or as to the amount or duration of compensation (including any question as to the nature or extent of disablement), the question shall, in default of agreement, be settled by a Commissioner for Workmen's Compensation duly appointed under Section 20 of the said Workmen's Compensation Act, 1923. And it is further agreed that the decision of the said Commissioner shall be final.

"Provided always that no compensation in respect of any injury shall be payable under these stipulations to any of the said crew who has instituted in a Civil Court a suit for damages in respect of the injury or has instituted a claim to compensation in respect of the injury under any law relating to the payment of compensation to workmen which is in force in the country in which the ship is registered."

It is apparent from the last quoted paragraph that the Indian Compensation Act was not intended or designed as an exclusive remedy to an injured sailor in cases where the injury occurred without the Dominion of India. The institution of the present action by libellant may effectively bar him from recovery under the Workmen's Compensation Act of the Dominion of India. According to the table introduced in evidence, compensation under said Act for the injuries sustained by the libellant herein would amount to 1680 Rupees, or approximately $500.

The voyage from England to Newport News, Virginia, immediately preceding libellant's injuries, was extremely rough but not particularly unusual in light of the March weather. Libellant submitted evidence tending to show that a vessel (light), subjected to such adverse weather conditions, would tend to bring about a misplacement of the hatch boards on the No. 2 'tween deck, where libellant ultimately sustained his injuries. By reason of the Court's consideration of the evidence, it becomes unnecessary to discuss this phase of the case.

The vessel arrived in the Chesapeake Bay area on Friday, March 26, 1954. She entered the drydock at Newport News on Monday, March 29. Entries in the log book indicate the following on March 30:

"Repair gang working in D. B.'s of Nos. 1, 2 & 3 holds replacing fore peak feed pipe in three places".

The log book reveals that additional work was done on the vessel. Libellant insists that no work was done by the shipyard in the No. 2 'tween deck prior to the accident. A deposition of one Colahan, the engineer superintendent for respondent stationed in New York, reveals that repairmen were seen working in the 'tween deck on March 29 and March 30, but this witness has no recollection of work being done in the lower hold. On March 31 the following entry appears in the log book:

"0820—Abdus Samad seaman while working in No. 2 tween deck stepped on a hatch board which upended and he fell to the lower hold sustaining multiple injuries".

As libellant was rendered unconscious for several days following his injuries,

it is reasonable to assume that some witness to the accident related the information contained in the log. The Court is without the benefit of any eye witness, although, of course, libellant has given his version of the accident.

During the voyage across the Atlantic, the hatch boards in the No. 2 'tween deck were placed by others of the deck crew, not including Samad. No lifelines were rigged around the square of the No. 2 'tween deck hatch. As previously indicated, the vessel was light, having discharged a cargo of grain in England. On the morning of the accident the "deck sarang" (the equivalent of a boatswain) instructed libellant, together with two other seamen, to proceed to the main deck, remove the canvas cover, remove the hatch boards, and clean the beams. Libellant was put in charge of cleaning the top deck and, by inference, he was similarly in charge of the performance of duties on the 'tween deck. In using the phrase "in charge", it is meant to convey the impression that, as between the three sailors, libellant was the seaman made responsible for an efficient performance of duties. After cleaning the top deck libellant was directed to "sweep and clean the 'tween deck". The work on the first or main deck was performed without incident and libellant then dropped his brooms on the third section of the 'tween deck. In the interim the main deck hatch boards had been removed, the light was good, and libellant could see, without difficulty, the general condition of the 'tween deck hatch boards. Libellant descended the ladder to the 'tween deck and observed that "everything looked safe" and "in proper shape", indicating that all hatch boards were, to the casual observer, in proper place. In approaching the third section to pick up his brooms, libellant stepped on a hatch board in the second section which obviously upended, thus precipitating libellant through the hole into the lower hold. In substance, this is all libellant knows with respect to the cause of his injuries.

There is no evidence that any officer or member of the vessel's crew ever inspected the hatch boards from the time they were placed on the 'tween deck during the course of the voyage, or thereafter, unless subsequent to the accident. The deposition of Colahan reveals that one or more of the hatch covers fell from the 'tween deck to the hold at the time of libellant's accident. The hatch boards following the accident were described as "sound and efficient" with no need of replacement or repair. The Chief Officer, Bain (not called as a witness), indicated the fallen hatch boards to Colahan, but no measurements were taken of the boards and there is no affirmative evidence that the boards would properly fit in the second section of the 'tween deck.

Two witnesses with considerable marine experience testified that, generally preparatory to loading, it is the accepted practice to send an officer to inspect the holds and ascertain their safety for work. Respondent's witness, Nicholson, denies any duty of inspection on the part of an officer and contends that it is entirely proper to delegate this duty to a seaman with ordinary experience. The difficulty with this contention is that the seaman is not advised as to whether a prior inspection has been made and upon what occasion. If it be true, as respondent urges, that employees of the Shipyard were working in the 'tween deck area, how is a seaman to be acquainted with these facts unless personally known to him? And how is a seaman to know that hatch boards on the 'tween deck may have been removed and later replaced by the repair gang?

The actual construction of the hatch board area is rather clearly described in the photographs and sketch prepared by the witness, Nicholson. While it is true that Nicholson's survey took place approximately one year following the accident, it is fair to assume that the general condition was substantially the same. The No. 2 'tween deck consists of four sections of hatches. The hatch boards are of 3-inch lumber, approximately

17½ to 19½ inches in width (depending upon the section for which the board was designed), with hand grips at each end. They are of varying lengths, also depending upon the section for which they are intended. The first or forward section carries a length of 13 feet 1½ inches. The second section (where libellant fell) carries a length of 8 feet 11¾ inches. The third section carries a length of 8 feet 3 inches. The fourth section carries a length of 4 feet 5¼ inches. Thus it may be seen that the respective hatch boards are designated for particular sections. The rather obvious cause of libellant's injuries lies in the placing of a third section hatch board in the second section.

The hatch boards are supported by hatch beams, at the top of which there are slotted channels for grain fittings. The hatch boards fit in these channels which may, for convenience, be designated as channel beams. In the second section, where libellant fell, there are two channel beams supporting opposite ends of the hatch board, and one bearing beam which lends support to the center of the hatch board. In effect, if the hatch board does not properly fit on the channel beams by reason of shortage of length or unusual wear, it resembles a "seesaw" operating over the bearing beam. Disregarding, for the moment, any tolerance with respect to the length of the hatch boards, it appears that the channel beams on the fore and aft parts of the second section each have a lip of 7 inches. This, of course, assumes a tight fit which would create an impossible situation in effecting the ready removal of the hatch boards. The effect of a third section hatch board placed in the second section would, assuming a tight fit, result in a shortage of 8¾ inches. The bearing beam, approximately in the center of the section, is 12 inches in width. As the width of the hatch boards used in the second and third sections are identical, i. e., 17½ inches, there is no difficulty *as to width* in placing the third section hatch boards in the second section and vice versa. A rough estimate as to the weight of the hatch board would be 45 pounds.

The hatch boards were marked with red and green paint, but as each chief officer has his own method of marking, there were at least three sets of markings on the boards. Tolerances found in the measurement of hatch boards for the second and third sections varied from 1 inch to 1½ inches. We have, therefore, a situation in which a third section hatch board placed in the second section would leave one end of the board resting on a lip of 1 inch, either fore or aft. If the board is not a perfect fit by reason of tolerance (it being admitted that the wooden hatch covers are not a cabinet maker's job), it could easily leave one end without any support other than the bearing beam and the channel beam on one side. A man crossing over such a cover would see a tight fit on one end, but a trifle over 8 feet in advance the board would be without support, all of which would be unknown to the party traversing such a course unless his eyes were fixed on this particular spot. The Court concludes that the unfortunate injuries sustained by libellant were caused in the manner hereinabove described or, if not exactly as described, were brought about by the force of libellant's stepping on a short hatch board, forcing the same forward a matter of inches, resulting in libellant's descent into the lower hold.

This case is replete with interesting questions of law. At the outset, respondents filed exceptions to the jurisdiction of the Court and, in a memorandum heretofore filed, jurisdiction was accepted under the authority of The Fletero v. Arias, 4 Cir., 206 F.2d 267, 1953 A.M.C. 1390, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398; The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152; Heredia v. Davies, 4 Cir., 12 F.2d 500; O. & Y. Nuri v. The Johanna, 4 Cir., 210 F.2d 261, 1954 A.M.C. 440.

We are now confronted with the matter of the applicable law in a case involving a Pakistan citizen, having signed aboard the vessel in India, with the vessel flying a British flag, and being in-

jured aboard the ship while she is in a drydock in the United States. The consideration of this question inevitably requires a review of the discussion of Mr. Justice Jackson in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 932, 97 L.Ed. 1254. With this in mind, this Court will endeavor to analyze the Larsen case as the same may apply to the existing state of facts.

### Place of Contract

■ The very agreement subscribed to by the libellant herein negatives the contention that the law of India is applicable with respect to the maritime tort. The agreement does not contemplate that libellant's only remedy in event of injury would be under the Workmen's Compensation Act of India. There is nothing in the contract to so limit libellant's right of recovery.

■ The Larsen case effectively disposes of the now respondent's contention relative to the law of India, where it is said:

"We do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort."

■ Thus far in this opinion there has been no mention of libellant's claim for wages and "waiting time" alleged to be due for violation of 46 U.S.C.A. §§ 596, 597, made specifically applicable to foreign vessels while in harbors of the United States. This is a public policy statute and hence precludes any consideration of the law of India.

The Court therefore concludes that the law of India has no application.

### Place of Wrongful Act

The Larsen case avoids a direct clash with the locality test by stating that it is unnecessary to determine the effect of same. There is considerable force lending support to the doctrine of *lex loci delicti commissi,* more especially when the place of the wrongful act is the same as that of the forum, but the inferences from Larsen, supra, lead this Court to believe that the territorial standard must yield to the law of the flag.

The Jones Act, 46 U.S.C.A. § 688 was the relief sought in Larsen. This Circuit in The Fletero, supra, expressed some doubt on the point involved but, from a careful reading of these two cases, the Court is of the opinion that the place of the wrongful act is not the guiding factor in determining the applicable law.

### The Law of the Forum

■ The law of the forum and, similarly, the inaccessibility of the foreign forum, were discussed in Larsen. While the latter point affords persuasive argument for exercising discretionary jurisdiction (as in this case), it has no effect as to the applicable law. The law of the forum is applicable as to wage claims involving violations of American statutes by foreign-owned vessels, but this is the extent of the forum in maritime cases involving only a foreign seaman aboard a foreign vessel.

### The Law of the Flag

This brings us, so far as this case is concerned, to the sole remaining applicable law with respect to the alleged maritime tort. On the theory that the ship is deemed to be a part of the territory whose flag it flies and on the further ground that there must be some law on shipboard which does not change with every change of waters, the Larsen case has this to say:

"It is significant to us here that the weight given to the ensign overbears most other connecting events in determining applicable law. * * * These considerations are of such weight in favor of Danish [law of flag] and against American law [law of forum and place of contract] in this case that it must prevail unless some heavy counterweight appears."

While Larsen had for its primary consideration the application of the Jones Act, it is significant that Justice Jackson made scant reference to this Act in set-

ting forth the guiding principles to govern a maritime tort claim.

█ It is, of course, elementary that the law of the flag has no effect upon a claim for violation of the wage statute relating to seamen, as such a construction would completely emasculate the intent and purpose of 46 U.S.C.A. §§ 596, 597, made expressly applicable to foreign vessels in the harbors of the United States.

█ It therefore follows in this case that the law of Great Britain governs the maritime tort and the law of United States regulates the alleged violations of the wage statute, 46 U.S.C.A. §§ 596, 597.

### The British Law

Admittedly there is little or no difference as to the rights of libellant to recover for his injuries under the British or American law. There are marked differences as to payment of wages but, as heretofore noted, the British law does not apply on this phase of the case. The British law grants a seaman the right to sue the ship owner at law for damages *and* to collect under any workmen's compensation award in accordance with the provisions of the Industrial Insurance Act, but, in the event of a recovery of damages, the compensation award is reduced by one-half of the total award that would normally be paid over a five year period. In substance, the British law on a seaman's rights to recover damages for a maritime tort are more favorable to the seaman than the American law.

On the subject of unseaworthiness, § 458(1) of the Merchant Shipping Act, 1894, provides:

"In every contract of service, express or implied, between the owner of a ship and the master or any seaman thereof, and in every instrument of apprenticeship whereby any person is bound to serve as an apprentice on board any ship, there shall be implied, notwithstanding any agreement to the contrary, an obligation on the owner of the ship, that the owner of the ship, and the master, and every agent charged with the loading of the ship, or the preparing of the ship for sea, or the sending of the ship to sea, shall use all reasonable means to insure the seaworthiness of the ship for the voyage at the time when the voyage commences, and to keep her in a seaworthy condition for the voyage during the voyage".

The two exceptions to the foregoing law are clearly inapplicable to the present case. Under this law, do we have presented a case of unseaworthiness? In the opinion of the Court we do. The doctrine of "common employment" has been abolished in England, so that we are not concerned with any theory of assumption of risk by reason of the negligence of any other member of the crew or officer.

█ The laws of Great Britain also permit a seaman to institute an action on the basis of negligence. In order to recover for negligence, libellant must prove:

(1) that the defendant was under a duty to take care;

(2) that he owed this duty to the plaintiff;

(3) that the defendant has failed to observe such duty, i. e. that he has been careless in carrying out the said duty, whether by omission to do what he ought to have done, or by commission in what he actually did; and

(4) that as a result of the defendant's breach of duty he has suffered damage.

██ If, of course, unseaworthiness exists under § 458(1) of the Merchant Shipping Act, 1894, it follows that the respondents herein breached a duty owed to libellant, and a recovery could be justified on the basis of negligence. Wholly aside from the theory of unseaworthiness, it would seem to be fundamental that the Master is under a duty to use reasonable care to prevent such an accident as occurred herein. With no evidence of any effort to inspect the placing of hatch boards at any time; with full knowledge that, inadvertent though it may be, a

misplaced third section hatch board would cause a dangerous condition when inserted in the second section; with knowledge (if it be true) that employees of the Shipyard had been working in the No. 2 hold, and no warning being imparted to libellant directing him to be particularly cautious; with respondents being fully aware of the necessity of libellant's walking on said hatch boards, presumed to be safe for its intended purposes; and with no effort made to take the testimony of any member of the crew of said vessel; all leads to the conclusion of negligence.

Little need be said on the subject of contributory negligence as the Court is of the opinion that such does not exist. Under the British law libellant's damages, in the event of contributory negligence, would be reduced as the Court "thinks just and equitable having regard to the claimant's share in the responsibility for the damage". In this respect, the British law is analogous to the defense of contributory negligence in cases instituted under our Jones Act. Respondents cite the English case of Dew v. United British S. S. Co., (1929) 139 L.T. 628. This case, decided prior to the modification of the law as to the defense of contributory negligence, involved a coal trimmer who tumbled down an *open hatch* on a ship at night, although he knew that, during the day, the hatch was open. In fact, the case may be considered as authority for the libellant in that the Court said:

"One would have thought, offhand, especially if one has any knowledge of ships, that if the hatch covers were on and anybody wanted to go that way to save himself going around the other end of the hatch, he would first jump on to the hatch and walk along the hatch covers".

What the English court advised is exactly what the libellant herein did—but libellant's case is strengthened in that he did what he was ordered to do.

While the American law is inapplicable, the similarity of the laws of both nations would compel a consideration of our authorities on the question of liability.

It is doubtful that the doctrine of *res ipsa loquitur* is applicable, but the reasoning of Judge Soper in the very recent case of Hill v. Atlantic Navigation Co., 4 Cir., 218 F.2d 654, 656, seems to be closely in point, when it was stated:

"It is established that when the place of an injury to a person is under the exclusive control of the owner, and the injured person is on the premises as an employee of the owner and is without fault, *and the injury is such as does not occur in the ordinary course of things if the person in control has exercised ordinary care,* there is evidence which, in the absence of explanation, warrants the inference that the injury was due to negligence on the part of the person in control."

If this be the law in this Circuit, assuming that libellant was without fault, why would not the same doctrine apply to this case? There is an intimation that Shipyard employees had been working in the No. 2 hold, but no evidence that the hatch boards on the No. 2 'tween deck had been moved. Certainly the hatch had not been opened prior to libellant's and his co-workers' commencing their duties. It is also rather significant that respondent did not endeavor to take the testimony of any Shipyard employees to establish the nature and location of their work immediately prior to the accident. The theory of the Hill case was established many years ago in Leyland & Co. v. Holmes, 5 Cir., 153 F. 557, 559, when a stevedore went upon a hatch cover and the supports collapsed without any known cause. The Court said:

"It is equally certain that a vessel is bound to have her hatches in such condition that her stevedores, invited by her to come on board, can open the hatches without danger to life or limb, provided they use reasonable care and prudence."

In the recent case of Malloy v. A/S Atlas, et al., 1955 A.M.C. 303 (decided

December 16, 1954), District Judge Ryan, in an oral opinion, said:

"The sole issue presented is unseaworthiness, and whether the hatch cover, particularly whether one of the planks in the hatch cover was too short, thereby occasioning plaintiff's injuries. The libellant asserts that it was three inches short. The respondent contends that it was a proper length.

\* \* \* \* \*

"He (libellant) stepped over onto the hatch cover which was not resting properly on the king beam in the center of the hatch and the plank upon which the libellant stepped fell with him through the hatch cover into the lower hold of the vessel.

\* \* \* \* \*

"I find that this particular hatch cover plank through which libellant fell was too short, that libellant sustained injuries solely by reason of the unseaworthiness of the vessel, in that the hatch plank was too short and presented a dangerous and unseaworthy condition".

This Circuit, in Hamburg-American Steam Packet Co. v. Baker, 4 Cir., 185 F. 70, 72, had before it a factual situation somewhat akin to the case at bar. In permitting a recovery, it was said:

" 'It is well known that in order to handle the hatch covers the men must go upon the hatch, and therefore they must be made reasonably safe to bear that weight and to hold their position under that strain, and if they are not and that is a permanent condition of the hatch of the ship, it is the fault of the ship. In this case it has led to a disastrous result.' "

While manifestly presenting a stronger case as to the proof with respect to the short hatch board, an otherwise very similar case is The Willkeno, 1938 A. M.C. 928, affirmed per curiam Williams S. S. Corp. v. Parsons, 4 Cir., 96 F.2d 219. The oral opinion of the late District Judge Luther B. Way was sustained by this Circuit and discusses in some detail the duty of inspection by officers of the ship as well as the issue of contributory negligence. It will be noted that the Court took cognizance of the resultant accident when it said:

"To an extent, at least, what occurred answers the contention that it was a reasonably safe place".

Other authorities supporting recoveries in cases involving failure of hatch boards or similar supports are: Consolidation Coastwise Co. v. Conley, 1 Cir., 250 F. 679; The Citta di Palermo, 5 Cir., 230 F. 602; The Earl of Dunmore, D. C.E.D.N.Y., 120 F. 858; The Colon, 2 Cir., 249 F. 460; The Harry Howard, D.C.Mass., 41 F.Supp. 19; Erquit v. New York and Cuba Mail S. S. Co., D.C. S.D.N.Y., 50 F. 325; The Baron Napier, 4 Cir., 249 F. 126; The Martha E. Wallace, D.C.S.D.N.Y., 151 F. 353; Cooney v. United States, D.C.W.D.Wash., 74 F. Supp. 26; The Yoxford, D.C.E.D.N.Y., 33 F. 521, 523, in which latter case the Court expressed uncertainty as to the cause of the accident, and said:

"My conclusion, therefore, is that the hatch-cover gave way when the libelant stepped on it, by reason of its own defect, and so precipitated the libelant into the hatch, without fault on his part. From that fact, the conclusion that the hatch was unsafe follows. Whether this unsafe condition resulted from a warp in the cover, or wear of the cover, or looseness of the fore-and-after, or all of these combined, is immaterial. It is plain that from one or all of these causes the cover was unsafe, and an improper covering for a hatch of this description. To provide such a covering for such a hatch was negligence which renders the ship liable for the injuries received by the libelant in consequence thereof."

Respondents rely upon Grillo v. United States, 2 Cir., 177 F.2d 904; The Theresina (Lloyd v. The Theresina), D. C.E.D.N.Y., 31 F. 90; and Baccile v. Halcyon Lines, D.C.E.D.Pa., 89 F.Supp.

765, to refute libellant's argument on liability. In Baccile libellant filed his action against the owners and operators of the vessel on which libellant was working as an employee of an independent contractor. The original defendants impleaded libellant's employer, and the parties agreed upon a nonappealable judgment in favor of libellant against the original defendants, leaving for determination the issue of liability between the ship owner and the employer of libellant. It is urged that the words of District Judge McGranery when he said, "The mere fact that the plank gave way is not sufficient evidence that the plank was defective", established a principle of law controlling in the present case. The very next sentence of the opinion negatives this thought and points out the permissible inference that the plank gave way because it was used in a manner in which it was not intended to be used. Baccile affords no relief to respondents herein.

The Theresina, supra, denied recovery against the ship but said that if the cover of the scuttle had broken under libellant's weight, a different case would be presented. The theory adopted by that Court is that the cover was disturbed in its place by trucks hauled over it that particular morning. The brief opinion cites no authority as such, but it is noted that the injuries were to a stevedore and The Theresina is referred to in later cases to support the view that there is no liability on a ship owner when the vessel has been turned over in a safe condition to an independent contractor to load and stow the cargo; the rule at that time being that a vessel in charge of stevedores or independent contractors is not liable in admiralty to such stevedores or independent contractors, or to their employees, for injuries, *unless a contractual relation existed between the vessel and the person injured,* or on account of the failure on the part of the owner, or those in charge of the navigation of the vessel, to perform a maritime duty or obligation, as a result of which injuries are received. The Clan Graham,

D.C., 163 F. 961, 966. As a contractual relation exists between libellant and respondents herein, The Theresina can hardly be held to support respondents' views. In fact, the rule expressed in The Clan Graham, supra, has been substantially, if not entirely, repudiated in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

Again in Grillo v. United States, supra, we have a matter involving injuries to a stevedore employed by an independent contractor with no contractual relationship existing between the vessel and the injured party. The libel was dismissed, however, for the principal reason that the trial judge wholly discredited libellant's testimony, all of which was flatly contradicted by respondent's witnesses.

On the whole, the decided weight of authority tends to support libellant's theory justifying a recovery on the basis of unseaworthiness, with strong inferences that negligence alone would be sufficient, and that libellant was not guilty of contributory negligence.

## The Jones Act

In light of the decision of this Circuit in The Fletero v. Arias, supra, libellant has abandoned any right of recovery under the Jones Act.

## Claim for Wages for Balance of Voyage

Libellant has abandoned any claim for wages covering the balance of the voyage, if such ever existed.

## Maintenance

Since the date of his injury libellant has been confined to the United States Public Health Service Hospital at no cost to himself. His claim for maintenance will be dismissed without prejudice to his right to again institute same, should it become necessary to do so.

## Claim for "Waiting Time" or Two-for-One Pay

At the time of his injuries libellant was entitled to earned wages aggregating $115.95. On April 2, 1954 (two days after libellant was injured), this sum

was deposited by the ship's master, through the ship's agents, with the Vice-Consul of the Kingdom of Great Britain. The evidence fails to reveal any effort on the part of the British Consul or Vice-Consul to pay this money over to libellant. For some few days libellant was in such a condition that any such effort would have been to no avail, but many months have elapsed since that time and libellant is still without his earned wages. On March 11, 1955, after respondents' exceptions to the jurisdiction had been overruled, the sum of $115.95 was paid into this Court by respondents, but the British Consul apparently still retains the amount deposited by the master.

The original libel made no claim for earned wages or "waiting time". The amended libel filed on October 13, 1954, asserts, for the first time, a violation of 46 U.S.C.A. §§ 596, 597. While it may well be that the amended libel was filed for the purpose of strengthening libellant's contention that this Court should exercise discretionary jurisdiction, the identical situation arose in The Fletero v. Arias, supra, and this Circuit permitted a recovery for "waiting time".

Under the British Merchant Shipping Act, 1906, Secs. 37, 38, and 39, provision is made for the disposition of the wages of any seaman left behind on shore in any place out of the United Kingdom on the ground of his unfitness or inability to proceed to sea. Sec. 37 requires the master to deliver to the proper authority (in this case the British Consul) a full and true account of the wages due. If the seaman is left in a British possession, the payment is made to the seaman, but if not in a British possession, payment is made to the British consular officer who retains one copy of the account and returns the other copy to the master. In turn, the master surrenders his copy of the account of wages to the Superintendent of the port of destination, if the port is in the United Kingdom, all of which must be done within 48 hours of the vessel's return to the port of destination pursuant to Sec. 38

of the Act. By the terms of Sec. 39 the British consular officer handles the seaman's wages as follows:

(1) If the seaman subsequently obtains employment at or quits the port at which the payment has been made, the Consul deducts any expenses incurred by reason of maintenance under the Merchant Shipping Acts, except such as the owner or master is obliged to pay, and pays the balance to the seaman.

(2) If the seaman dies before his ship quits the port, the Consul handles the wages as part of the property of a deceased seaman.

(3) If the seaman is sent to a proper return port at the public expense under the Merchant Shipping Acts, the Consul accounts for the wages to the Board of Trade, and the sum is subsequently dealt with as wages of the seaman.

Thus it appears that, under the British law, nothing can be done with respect to the disposition of libellant's wages until he obtains employment in the United States or quits this port, or, finally, until he returns to Calcutta.

The conflict with our statute, 46 U.S.C.A. §§ 596, 597, is apparent. As these statutes are made expressly applicable to foreign seamen on foreign vessels while in ports of the United States, the sole remaining issue for consideration is whether a master, having complied with the British law, is exonerated from the provisions of the statute under the theory that his "refusal" or "neglect" to make payment of the wages is with "sufficient cause". The statute, after reciting the requirement of paying the balance of earned wages, reads:

"Every master or owner who *refuses or neglects* to make payment in the manner hereinbefore mentioned *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court".

■ There is no merit to the argument that the libellant is barred by laches in failing to assert his claim for wages and "waiting time" until three months after the filing of the original libel and nearly seven months after the accident. We must remember that we are here confronted with a libellant who neither speaks, reads, nor writes the English language. The difficulties encountered by his proctor in procuring all essentials of libellant's claim are obvious—his physical condition, the necessity of frequent operations, and his continued confinement in the hospital, furnish sufficient answer to the plea of laches.

The British law imposes a fine of ten pounds on every master who fails to comply with the British law relating to wages. That the master did comply with the British law is conceded. But the master is similarly subject to the laws of our country as to wages of seamen while in the harbors of the United States, and to hold that payment may be made by the master to a consular officer would completely destroy the effectiveness of our statute as the same applies to foreign seamen. Faced with this dilemma what should a master or owner do? The only alternative appears to be what was ultimately done by the owner in this case when payment was made into court even though the British Consul still retains libellant's earned wages. If, under such circumstances, it becomes necessary to pay the seaman his earned wages under the American law, as well as to pay the Consul under the British law, the recourse of the owner must rest with the Board of Trade or British courts.

Respondents cite the case of The Lyman D. Foster, D.C., 85 F. 987, decided in 1898. The "waiting time" was made applicable to seamen on foreign vessels while in harbors of the United States under an Act of Congress dated March 4, 1915, c. 153, 38 Stat. 1164. The validity of the Act was approved in Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607. There is no longer room for argument as to its applicability to seamen on foreign vessels while in the harbors of this country. The Lyman D. Foster, supra, is foreign to the issue here involved and no question of "sufficient cause" is presented. While respondents urge that Foster is authority for the proposition that the British Consul, in this case, is the agent and representative of the libellant herein, such a construction is rather strained. The British Consul is a representative of the Kingdom of Great Britain and probably could not be classified as an agent of the vessel or seaman.

This Circuit has ruled that the provisions of a statute supersede those of a prior treaty inconsistent therewith. Lakos v. Saliaris, 116 F.2d 440. It was there stated that a deposit of a portion of the wages, under the guise of "war bonus", in the Bank of Greece, was in contravention of our statute. The vessel by entering the American port became subject to that law, and no contract, understanding, foreign law, or treaty which violates the statute may be given effect. Patterson v. Bark Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002; Lakos v. Saliaris, supra.

The clear intent of the statute is mandatory and the courts of this country will not permit technical evasions through the medium of payments to the Consul in cases such as this.

■ The ultimate payment of earned wages into the registry of the Court would stop the running of the "waiting time" if said payment had included the statutory penalties to the date of payment. The Fletero v. Arias, supra. But a conditional tender or, as in this case, a partial tender, has no such effect. Gerber v. Spencer, 9 Cir., 278 F. 886.

■ The number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case. Mystic S. S. Co. v. Stromland, 4 Cir., 20 F.2d 342, certiorari denied 276 U.S. 618, 48 S.Ct. 213, 72 L. Ed. 734; Mavromatis v. United Greek

Shipowners Corporation, 1 Cir., 179 F. 2d 310, 316. The earned wages were paid to the Vice-Consul on April 2, 1954. The case was heard on June 8, 1955. It is reasonable to assume that, for a period of 30 days, the physical condition of libellant was such as to preclude any efforts to effect payment. Allowance of double wages will accordingly be made from May 3, 1954, to June 7, 1955, both inclusive, at a daily wage rate of $1.26⅔, or $2.53 for each and every day during the period stated, plus $115.95 earned wages. The total of 401 days calls for a recovery of $1014.53 under the "waiting time" statute.

### Immunity of British Consul

The British Consul and Vice-Consul were properly served with subpoenas to appear as witnesses in behalf of the respondents. At the end of the first day of trial, proctors for respondents requested the Court to recognize the Consul for his appearance in Court on the following morning. The Consul, R. L. Cook, had been present in Court during the entire day. The Consul at first refused to be recognized for his appearance and the Court, after fully explaining to the Consul that the question of *immunity from testifying* was not presented *at that time,* reluctantly ordered the Consul to the custody of the United States Marshal in view of the Consul's continued refusal to appear in court on the following morning. The record indicates that, after an estimated six minutes, the Consul was called in chambers whereupon the Court went over, in detail, the provisions of the Consular Convention dated June 6, 1951, between the United States of America and the United Kingdom of Great Britain and Northern Ireland.[1] Within a matter of fifteen minutes the British Consul agreed to be recognized for his appearance in Court on the following day and was released.

The next day the Consul and Vice-Consul were called as witnesses. After identifying themselves, they were asked certain questions relating to the wages, their visits to libellant at the hospital, etc. These questions the witnesses refused to answer, claiming immunity under the Consular Convention above stated. Proctor for libellant moved the Court to hold the witnesses in contempt. No like motion was made by proctors for respondents and, as the documentary evidence later developed, the witnesses could not have assisted libellant in any event, although it is possible that the Consul may have aided the respondents in stopping the running of the "waiting time" had he testified that he had tendered the earned wages to libellant, which tender had been refused.

No advance request was made by the Consul to the Judge of this Court seeking relief from appearing as a witness, although it appears that in January, 1955, the Consul then knew that his testimony would be sought. There is nothing in the Consular Convention which exempts a Consul from responding to a subpoena. In fact, until the questions are propounded to the witness, it is impossible to determine whether immunity exists under Art. 10(4) which reads:

> "A consular officer or employee shall be entitled to refuse a request from the courts or authorities of the territory to produce any documents from his archives or other official papers or to give evidence *relating to matters within the scope of his official duties.* Such a request shall, however, be complied with in the interests of justice if, in the judgment of the consular officer or employee, it is possible to do so without prejudicing the interests of the sending state. A consular officer is also entitled to decline to give evidence as an expert witness with regard to the laws of the sending state".

Other than as hereinabove provided, a consular officer or employee may be re-

1. Effective September 7, 1952. Signed by the President of the United States on September 8, 1952. Senate consent to ratification by Resolution dated June 13, 1952. Treaties and Other International Acts series 2494. Department of State Publication 4729.

quired to give testimony in either a civil or criminal case. How, then, is any court to determine whether the evidence relates to matters within the scope of official duties until the questions are propounded or, at least, until the matter is officially brought to the attention of the presiding judge in advance of trial, thereby enabling the court to convene counsel and explore the nature of the contemplated inquiries? While there is no doubt but that the Consul was advised by one or more attorneys in this case as to the testimony sought, it is certainly not incumbent upon the court to examine the list of witnesses and to speculate as to the nature of their testimony.

 Letters were written by the Consul and Vice-Consul addressed to the Clerk of the Court in which it is stated that immunity was claimed. These letters were received by the Clerk on the afternoon of the first day of trial and not transmitted to the Judge until late that afternoon. Had the Consul requested the courtesy of an advance interview as to his status in this case, the Court would have been glad to have granted same after arranging for the presence of the interested attorneys. In the absence of permission from the Court to disregard the subpoena, any Consul must appear in answer thereto.

The High Contracting Parties saw fit to place "Shipping" as a separate part of the Consular Convention. Art. 22 provides in part:

"The judicial authorities of the territory may, however, exercise any jurisdiction which they may possess under the law of the territory with regard to disputes as to wages and contracts of service between the master and members of the crew".

Thus we note that the right to exercise jurisdiction as to wage disputes (partially involved in this case) is unquestioned. The British law on the subject of wages is, in certain respects, directly in conflict with our 46 U.S.C.A. §§ 596, 597. The master of a British vessel is required to pay over to the Consul the wages of a seaman left in a foreign port, yet the Consul is cloaked with apparent immunity from disclosing the details of such payment. How the interests of the sending state could be prejudiced in such a situation is unknown to the Court. It is also noted that the terms of the Consular Convention specify compliance by the Consul when, in the interest of justice it is possible to do so without prejudicing such interests, but this clause vests in the Consul the sole determination as to his course of action. Furthermore, Art. 27(2) of the Convention provides that where the consular officer is given the right to perform any functions, it is for the sending state to determine to what extent its consular officers shall exercise such right.

It is apparently well settled that consular officers are entitled to such privileges and immunities as may be accorded to them by treaty, as where they are by convention exempted from compulsion to appear as witnesses in a court proceeding. 3 C.J.S., Ambassadors and Consuls, § 12(c), p. 1025. The Consular Convention in question grants such immunity under certain circumstances and it is not the function of any court to question the exercise of the discretionary judgment reserved to the Consul. In the absence of any provision in the Convention removing the obligation of the Consul to respond to the subpoena, he has a duty to appear, but the propriety of his testifying in a matter within the scope of his official duties rests upon him. The Consul and Vice-Consul were accordingly entitled to immunity from testifying with respect to their official duties and the motion to hold said parties in contempt of court is denied.

### The Damages

It is urged that, if recovery is permitted, the Court should take cognizance of the economic conditions existing in Pakistan where libellant is a citizen. While admittedly libellant must ultimately leave the United States (unless otherwise protected by Act of Congress), it does not necessarily follow that he must return to Pakistan.

As to his loss of earnings, present and future, we have evidence of his earning power to the extent of $38 per month, all of which is being considered by the Court. At the time of his injury libellant was 34 years of age with an expectancy of life of 34.29 years (American Mortality Tables). The present value of $1 per annum for 34 years, discounted at 3%, is $21.13184, and at 3½% is $19.70068.

That libellant was seriously and permanently injured is conceded. Without endeavoring to detail the nature of the injuries, the uncontradicted medical evidence reveals that he sustained (1) an oblique type fracture in the neck of the right femur, (2) a compound comminuted fracture of the right femur, (3) fractures of the third, fourth, fifth and sixth ribs on the left side, and (4) a fracture of the nose. The injury to the right femur required the insertion of a Cushener wire with the leg placed in traction. On October 12, 1954, an open reduction operation was performed on the neck of the right femur and a bone graft inserted along with two metal screws, all of which was made necessary by the failure of the fracture to unite. At the time of trial libellant had practically no motion present in his right hip, and such motion as existed brought about acute pain. Motion in the right knee was limited by ten degrees of complete extension and 60 degrees of complete flexion.

The prognosis is dubious. The ununited fracture of the neck of the right femur still causes pain and the alternatives appear to be (1) remove the metal screws and determine whether there is a living cartilage on the head of the femur, (2) if the cartilage is viable or living, perform an osteotomy (breaking) of the femur and insert a particular type of metal, (3) if the cartilage or head is degenerated, perform an orthoplasty, known as a plastic of the hip joint, which will give stability and relieve the pain, but will leave libellant with a permanent limp that will adversely affect his ability to do heavy work, (4) perform a hip fusion making same solid with no motion, thus relieving the pain but limiting his ability to get about, and (5) remove the head and insert a metal prosthesis which is another femoral head, which may leave him with some pain and weakness.

Libellant has followed the sea since the age of fourteen. Regardless of the procedure adopted, he cannot continue this means of earning his livelihood by reason of lack of stability. He will be restricted to non-laboring capacities such as an elevator operator, night watchman, and the like. His period of total disability estimated from the date of the injury would be approximately twenty months, after which he would be ambulatory.

In determining the loss of earning power it is proper to consider what libellant would have earned in or near the locality where he resides, but this has been fairly well established by his admitted wages of $38 per month, the continuance of which is eliminated unless libellant is successful in securing employment of the type heretofore mentioned. However, in ascertaining the compensatory value of his pain and suffering, etc., it is well settled that this Court must apply the law of the place where the maritime tort is committed which, in this case, is the same as the law of the forum. 25 C.J.S., Damages, § 4(a), p. 462; The Gylfe v. The Trujillo, 2 Cir., 209 F.2d 386.

Bearing in mind the loss of earnings, pain and suffering, probable duration and extent of the injuries, and all other factors usually considered in arriving at a proper award, it is the conclusion of the Court that libellant is entitled to recover his earned wages deposited in Court, plus "waiting time" as hereinabove provided, together with the additional sum of $37,500 by way of compensatory damages and loss of earnings.

Request to Further Examine Libellant

In their brief respondents request permission to recall libellant for further cross-examination to confront him with alleged conflicting statements

made at the time of taking discovery depositions. Presumably these matters are directed to his conversations with the British Consul, the pertinency of which is unknown to the Court. Even if material, this privilege should not be granted. The discovery depositions were taken and transcribed well in advance of trial. That respondents did not see fit to question libellant as to the alleged conflicting statements is not the fault of the Court. It will be noted that the employment of interpreters from New York was required. To require the further presence of the interpreters would do violence to the discretionary powers of this Court.

Proctor for libellant will prepare an appropriate decree in accordance with this opinion which is adopted as the Court's findings of fact and conclusions of law pursuant to Admiralty Rule 46½, 28 U.S.C.A. and, after presentation to proctors for respondents for inspection, submit the same to the Court for entry.