THE ILLINOIS COMMERCE COMMISSION, Petitioner-Appellant, *v.* NICHOLAS S. SALAMIE, Respondent-Appellee.

First District (4th Division)   No. 76-385

Opinion filed October 20, 1977.

466

James B. Moran, of Chicago, for appellant.

Adamowski, Newey & Adamowski, of Chicago (Paul D. Newey and Robert E. Adamowski, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The issues before the court in this case are (1) whether an Illinois citizen can avoid testifying before the Illinois Commerce Commission as to the Arab boycott simply because he is a honorary consul for Lebanon and (2) whether even if he is not immune from giving testimony, the Illinois court is powerless to enforce the subpoena because section 1351 of title 28 of the United States Code provides that the Federal district court has exclusive jurisdiction of all actions and proceedings against consuls. The trial court ruled that it lacked jurisdiction to decide the immunity issue because the Federal statute had preempted all jurisdiction. We reverse, holding (1) that the respondent has no right to refuse to testify except as to matters connected with the exercise of his functions as an honorary consul and that it is for the commission and the court, not the consul, to make the initial determination as to whether the matters appear to be within the scope of his official duties and (2) that despite the broad language of section 1351, it is for the State, not the Federal court, to enforce a State subpoena.

Nicholas S. Salamie (Salamie), the respondent in this case, is an American citizen living in LaGrange, Illinois. He came to the United States from Lebanon over 30 years ago. He is a retired pharmaceutical chemist. He is also an honorary consul for Lebanon, for which position he receives no pay. According to certain news stories, which spawned from a speech he made in 1975, Salamie administers the Arab boycott on behalf of 20 different nations. That is, he refuses to legalize shipping invoices for orders from Illinois firms to any of the 20 countries if the firm is blacklisted by the Arab League. The only way a firm can be approved is to agree not to sell or trade with Israel. Because of all the controversy arising in 1975 over American firms illegally yielding to the Arab boycott, the Illinois Commerce Commission decided to investigate whether any motor or rail carriers had engaged in ethnic or religious discrimination against certain of their shippers, in violation of the Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, pars. 18—313, 18—702), and of the Illinois Public Utility Act (Ill. Rev. Stat. 1973, ch. 111 2/3, pars. 38, 44, 52 and 77), and if so, at whose behest. In the course of this investigation, Salamie was subpoenaed to give testimony as to the manner in which the boycott is made effective through the refusal to legalize shipping invoices and the names of persons and entities involved in such refusal of shipments in Illinois. Salamie refused to appear on the grounds the subpoena was void since he was consul for Lebanon. Originally his objection was no more specific than this, but in court he has argued that there was no jurisdiction because he had decided the matters under inquiry were privileged as being within the scope of his functions as honorary consul. Mr. Kabbani, Lebanon's ambassador to the United States, wrote stating that any of Salamie's activities in connection with the Arab boycott would qualify as acts performed in the exercise of his consular functions. The State Department has given no opinion as to whether such activities are protected, but simply noted in a letter dated October 17, 1975, that a consular official should have an opportunity, prior to the instigation of compulsory measures to secure testimony, to present arguments as to whether the evidence falls within the treaty protection. This, apparently, the Illinois Commerce Commission has at all times been willing to provide.

Upon Salamie's refusal to appear before the Commission, the Commission filed a petition for attachment for contempt of court in the circuit court of Cook County to compel him to attend the Commission hearing for the purpose of giving testimony and producing documents referring or relating to the blacklist. It also asked the court to establish guidelines respecting the scope of his testimony and the production of the documents. After hearing arguments the court dismissed for want of

jurisdiction on the ground that under section 1351 of the Federal Judicial Code any action must be commenced in the Federal district court.

## I.

■■ The respondent's contention that he has diplomatic immunity under section 252 of chapter 22 of the United States Code is totally without merit. That statute simply grants immunity to ambassadors and public ministers and their domestics. Consuls and vice consuls are not ambassadors or public ministers. (*Carrera v. Carrera* (D.C. Cir. 1949), 84 U.S. App. D.C. 333, 174 F.2d 496; *Auer v. Costa* (D. Mass. 1938), 23 F. Supp. 22.) Indeed, the United States Constitution in article III refers to ambassadors and other public ministers and consuls. The mention of consuls as a separate designation or classification would hardly have been necessary if they were included in the other terms.

## II.

The first issue we must consider, therefore, is whether Salamie can refuse to testify simply because he is a consul for Lebanon. Basically there are two types of consuls, career consuls and honorary consuls. (Article 1(2) of the Vienna Convention on Consular Relations,[1] hereinafter called the Vienna Convention.) Career consuls are just what their name implies. They are always citizens of the sending State (1 Oppenheim, International Law 656 (4th ed. 1928); M. Gamboa, Elements of Diplomatic and Consular Practice, A Glossary 127 (1966)), and, indeed, according to article 57 of the Vienna Convention they may not, if they are to retain their privileges and immunities, carry on any private gainful occupation in the receiving State. According to the Vienna Convention a career consul has certain privileges and immunities among which are the following:

"Article 41

Personal inviolability of consular officers

1. Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority.

2. Except in the case specified in paragraph 1 of this Article, consular officers shall not be committed to prison or liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

---

[1] 21 U.S. Treaties and other International Agreements 77-123 (1970)
The Vienna Convention was signed in Vienna in 1963 and ratified by the United States on September 24, 1969. Under article VI of the United States Constitution it is the supreme law of the land.

3. If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this Article, in a manner which will hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this Article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.

## Article 43

Immunity from jurisdiction

1. Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions.

2. The provisions of paragraph 1 of this Article shall not, however, apply in respect of a civil action either:

(a) arising out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending State; or

(b) by a third party for damage arising from an accident in the receiving State caused by a vehicle, vessel or aircraft.

## Article 44

Liability to give evidence

1. Members of a consular post may be called upon to attend as witnesses in the course of judicial or administrative proceedings. A consular employee or a member of the service staff shall not, except in the cases mentioned in paragraph 3 of this Article, decline to give evidence. If a consular officer should decline to do so, no coercive measure or penalty may be applied to him.

2. The authority requiring the evidence of a consular officer shall avoid interference with the performance of his functions. It may, when possible, take such evidence at his residence or at the consular post or accept a statement from him in writing.

3. Members of a consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions or to produce official correspondence and documents relating thereto. They are also entitled to decline to give evidence as expert witnesses with regard to the law of the sending State."

As to their archives, Article 33 provides that:

> "The consular archives and documents shall be inviolable at all times and wherever they may be."

Basically, an honorary consul is one who is not a career consul. They need not be citizens of the sending State and may even be citizens of the receiving State. For this reason the receiving State may refuse to receive an honorary consul (article 22(2))[2] since there may be a question of divided loyalties.

Under the Vienna Convention an honorary consul's rights and privileges are far more limited than those of a career consul. Article 58(2) of the Vienna Convention provides that articles 42 and 43, paragraph 3 of article 44, and paragraph 1 of article 55 (hereinafter set forth) apply to honorary consular officers. Thus, by implication, paragraphs 1 and 2 of article 44 are not applicable. And although certain other privileges are granted to honorary consuls, none are relevant to this case.

As to archives, it is provided in article 61 of the Vienna Convention that:

> "The consular archives and documents of a consular post headed by an honorary consular officer shall be inviolable at all times and wherever they may be, provided that they are kept separate from other papers and documents and, in particular, from the private correspondence of the head of a consular post and of any person working with him, and from the materials, books or documents relating to their profession or trade."

Article 33 does not apply.

However, Salamie does not even have all of the privileges and immunities provided to honorary consuls. Salamie is a citizen of the United States. As provided by article 1(3) of the Vienna Convention the rights of citizen consuls are governed by article 71. Article 71 of the Vienna Convention provides that:

> "1. Except in so far as additional facilities, privileges and immunities may be granted by the receiving State, consular officers who are nationals of or permanently resident in the receiving State shall enjoy only immunity from jurisdiction and personal inviolability in respect of official acts performed in the exercise of their functions, and the privilege provided in paragraph

---

[2] "Article 22

Nationality of consular officers

1. Consular officers should, in principle, have the nationality of the sending State.

2. Consular officers may not be appointed from among persons having the nationality of the receiving State except with the express consent of that State which may be withdrawn at any time.

3. The receiving State may reserve the same right with regard to nationals of a third State who are not also nationals of the sending State."

3 of Article 44. So far as these consular officers are concerned, the receiving State shall likewise be bound by the obligation laid down in Article 42. If criminal proceedings are instituted against such a consular officer, the proceedings shall, except when he is under arrest or detention, be conducted in a manner which will hamper the exercise of consular functions as little as possible."

No other privileges are applicable. In other words, it would appear to have been the intention of the drafters of the treaty to recognize that such a consul, being a citizen of the receiving State, should normally be treated just as any other citizen of the receiving State, and that, therefore, only those privileges, limited in nature, which were absolutely necessary to the official performance of his consular duties were granted to him.

■■■ As provided in the Vienna Convention, a consul may be called upon to give testimony in a judicial or administrative hearing. He may decline to give evidence concerning matters connected with the exercise of his functions or to produce official correspondence and documents relating thereto (article 44(3)). That is the only time he has the *right* under the treaty to decline to testify or to produce documents. However, if the consul is a career consul, he may refuse to testify even when he should not refuse and no coercive measure or penalty may be applied to him. (Article 44(1); *United States v. Wilburn* (5th Cir. 1974), 497 F.2d 946.) But Salamie is not a career consul. He is an honorary consul and a citizen of the United States. As such, under the treaty, only paragraph 3 of article 44 is applicable to him. Paragraph 1 is not. It follows, therefore, that he may only decline to give testimony as to matters connected with the exercise of his function. If he refuses to testify and this refusal is not proper, then coercive measures may be applied to him. Compare *Jay-Thorpe, Inc. v. Brown* (City Ct. 1943), 43 N.Y.S. 2d 728, where the court upheld a subpoena against an honorary consul on the basis of common law where the matter had no relation to the consul's obligation to the sending country.

Since we do not know what questions the Commission desires to ask, it is not possible for us at this time to rule on the propriety of each question. Nevertheless it is possible for us to determine whether the general subject matter of the Commission's investigation is so patently within the scope of Salamie's duties as defined by the Vienna Convention as to be obviously privileged.

On oral argument, the attorney for the Commission announced that the Commission did not propose to ask any questions concerning shipments to or through Lebanon. Accordingly, we do not need to determine whether such questions would be privileged, although we doubt that questions not concerning the shipping of goods by Lebanese vessels

would fall within the scope of Salamie's consular functions as set forth in article 5[3] of the Vienna Convention.

---

[3] "Article 5

Consular functions consist in:

(a) protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law;

(b) furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them in accordance with the provisions of the present Convention;

(c) ascertaining by all lawful means conditions and developments in the commercial, economic, cultural and scientific life of the receiving State, reporting thereon to the Government of the sending State and giving information to persons interested;

(d) issuing passports and travel documents to nationals of the sending State, and visas or appropriate documents to persons wishing to travel to the sending State;

(e) helping and assisting nationals, both individuals and bodies corporate, of the sending State;

(f) acting as notary and civil registrar and in capacities of a similar kind, and performing certain functions of an administrative nature, provided that there is nothing contrary thereto in the laws and regulations of the receiving State;

(g) safeguarding the interests of nationals, both individuals and bodies corporate, of the sending State in cases of succession *mortis causa* in the territory of the receiving State, in accordance with the laws and regulations of the receiving State;

(h) safeguarding, within the limits imposed by the laws and regulations of the receiving State, the interests of minors and other persons lacking full capacity who are nationals of the sending State, particularly where any guardianship or trusteeship is required with respect to such persons;

(i) subject to the practices and procedures obtaining in the receiving State, representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests;

(j) transmitting judicial and extra-judicial documents or executing letters rogatory or commissions to take evidence for the courts of the sending State in accordance with international agreements in force or, in the absence of such international agreements, in any other manner compatible with the laws and regulations of the receiving State;

(k) exercising rights of supervision and inspection provided for in the laws and regulations of the sending State in respect of vessels having the nationality of the sending State, and of aircraft registered in that State, and in respect of their crews;

(l) extending assistance to vessels and aircraft mentioned in sub-paragraph (k) of this Article and to their crews, taking statements regarding the voyage of a vessel, examining and stamping the ship's papers, and, without prejudice to the powers of the authorities of the receiving State, conducting investigations into any incidents which occurred during the voyage, and settling disputes of any kind between the master, the officers and the seamen in so far as this may be authorized by the laws and regulations of the sending State;

(m) performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State."

■■  Sections (a) and (e) of article 5 do confer broad power on the consul to protect the interests of the sending State and its nationals. But these actions should be read in light of article 55(1) which provides:

> "Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State. They also have a duty not to interfere in the internal affairs of that State."

This article is specifically made applicable to honorary consuls. Obviously since article 55(1) provides it is "without prejudice to their privileges and immunities," it cannot be construed to mean that the doing of a single illegal act takes the activity outside the scope of the consular functions except where specifically so provided in article 5 (e.g., (f), (h), (i) and (m)); but we do believe that this article means that a consul cannot embark upon a prolonged course of conduct flagrantly in violation of the criminal laws of this country and defend it as being within the scope of his consular functions. For example, we doubt that an honorary consul could undertake to burn down all of the factories in this country competing with those in the sending State and hide behind his consular privilege. It is even clearer that the activities in question here are not protected by sections (d) or (m) of article 5. Section (d) refers only to visas or appropriate documents (presumably similar to visas) issued to persons wishing to travel to the sending State. It says nothing about persons wishing to trade with the sending State. Since section (m) specifically requires that the activities not be in violation of the receiving State, the activities in question here cannot fall under section (m) unless they were referred to in the international agreement in force between the sending State and the receiving State. There is no evidence in the record that they were.

Since the remaining sections of article 5 except (k) and (l) obviously do not apply to the activities in question, it is, as we said, doubtful that any of the activities in question except those relating to Lebanese vessels, fall within the scope of article 5. But we need not decide that question. We do conclude that it is unlikely that insofar as the boycott is administered on behalf of the 19 other States, besides Lebanon, and the Commission has indicated its intention to so limit its questions, such activity falls within the scope of his consular functions and is therefore privileged. Article 8 of the Vienna Convention provides:

> "Upon appropriate notification to the receiving State, a consular post of the sending State may, unless the receiving State objects, exercise consular functions in the receiving State on behalf of a third State."

There is no evidence in the record that the United States government was notified that Salamie intended to administer the Arab boycott on behalf of 19 other countries, or that if so notified, the United States government

failed to object. At least on remand Salamie will have a heavy burden to show that such activites in some way fall within the perimeters of article 5.

## III.

Salamie, however, argues that the court must accept his determination that the activities were within the scope of his official duties and the court cannot review that determination, citing *United States v. Wilburn* (5th Cir. 1974), 497 F.2d 946; *Heaney v. Government of Spain* (2d Cir. 1971), 445 F.2d 501, and *In re Estate of King Faisal II* (Sur. 1960), 23 Misc. 2d 300, 199 N.Y.S. 2d 595. None of these cases are controlling.

■■ The court in *Wilburn* did state, as dictum, that it was for the consul, not the Texas court, to determine whether the evidence subpoenaed was a document relating to the exercise of the consular function. But the document was in fact at least *prima facie* within the scope of the consul's functions. One of the consul's functions was the issuance of travel documents to persons desiring to travel in Mexico. The document requested was an application for a tourist card filed by a specified person. In the present case, there is no apparent relationship between the official duties of the honorary consul and the activities sought to be examined. Absent some evidence of such a relationship, we cannot allow an honorary consul who enjoys the benefits of citizenship of the United States and of Illinois, and who is subject to the laws of both, to avoid his responsibilities as a citizen and resident to testify when subpoenaed, by a mere claim without any substance at all, that the evidence sought falls within his consular functions.

*Wilburn* also is not controlling because the consul in that case was a career consul. As such, she could not be forced to testify whether her refusal was proper or not.

*Heaney* is in no way in point. To the contrary, the court in that case pointed out that other than conclusory allegations that the consul's activities "were incompatible with the exercise of consular functions" (445 F.2d 501, 505), plaintiff pointed to nothing which would suggest that the activities would not fall within the scope of article 5(m). In other words, the court would not have been willing to depend on the plea of immunity had any evidence been produced to the contrary. Here, of course, the evidence is not clear that the acts fall within the scope of his functions. Furthermore, the activity involved (arranging for propaganda against Great Britain) was held by the court in *Heaney* to be strictly a political and public act and not a commercial act such as we have in this case. Finally, again the consul in *Heaney* was a career consul not an honorary consul.

The Surrogate Court of New York in *In re Estate of King Faisal II* did

hold that the officer had the exclusive right to decide if the information sought was concerned with official business and the court could not make an initial inquiry in connection with that question. The only case cited by *In re Estate of King Faisal II* for that point was *Samad v. The Etivebank* (E.D. Va. 1955), 134 F. Supp. 530. But in fact *Samad* held to the contrary in that the court ruled that until the questions were propounded to the witness, it was impossible *for it* to determine whether they related to matters falling within the scope of his official duties. Only after the court determined that they did fall within the scope of official duties could the consul refuse to testify. Since the treaty involved in that case gave the consul the right to refuse to testify under those circumstances, even though he should testify if it did not prejudice the interests of the sending State, the court could not question the exercise of the discretionary judgment reserved to the consul. But this was only after the court, not the consul, had made the determination the matters fell within the scope of the official duties, not before.

The Supreme Court of the United States has not yet ruled on the question as to who makes the determination whether the evidence relates to matters falling within the scope of the consul's official functions and what evidence is necessary in order to make that determination. But it has ruled on the question as to whether a claim made by a State that a vessel is the property of that country is binding on the court. In *Compania Espanola de Navegacion Maritima, S.A. v. Spanish Steamship Navemar* (1938), 303 U.S. 68, 82 L. Ed. 667, 58 S. Ct. 432, the court ruled that it was not the duty of the court, upon the presentation of the suggestion, to dismiss the libel for want of admiralty jurisdiction. It held that the filed suggestions, though sufficient as a statement of the contentions made, was not proof of its allegations. Following this case, the Restatement of Foreign Relations (section 72, comment (b)) has adopted the rule that where a State claims immunity it must do more than suggest it; it must also prove most of the facts that underlie its claim of immunity. We believe that an honorary consul should do no less.

Salamie also argues that any documents the Commission seeks to discover are privileged as being part of the consular archives. Article 71 of the Vienna Convention which pertains to citizen consuls does not refer to either article 33 or article 61. Thus it is doubtful that this privilege can be claimed by citizen consuls. Assuming that either article is applicable, however, only article 61 and not 33 can be applicable as the latter refers only to career consuls who have not forfeited their immunities by working at a private business in this country. Article 61 provides that the consular archives and documents shall be inviolable only if they are kept separate at all times from other papers and documents. Accordingly, to claim the privilege, Salamie would have to prove both that the documents

relate to his consular functions as defined by article 5 and that they have not been commingled with other documents which are not privileged.

## IV.

■■ Since this court has determined that at least some of the information sought by the Commission may not be privileged as pertaining to matters within the scope of Salamie's consular functions, we must determine whether this court has jurisdiction over Salamie to force him to testify or whether Salamie, although a citizen of Illinois and the United States and subject to its laws, can escape the jurisdiction of the Illinois courts simply because in work unrelated to that under question he acts as an honorary consul for Lebanon. The trial court held that State courts do not have jurisdiction since section 1351 of title 28 of the United States Code[4] must provide that:

> "The district courts shall have original jurisdiction, exclusive of the courts of the States, of all actions and proceedings against consuls or vice consuls of foreign states."

■■ ■ First, we must note that the Illinois courts and commissions definitely have the authority to issue subpoenas against consuls. (*United States v. Wilburn* (5th Cir. 1974), 497 F.2d 946.) A subpoena is not an action or proceeding against the consul. Furthermore, the Vienna Convention expressly allows even career consuls to be subpoenaed to give testimony and the statute must be read in the light of the treaty. (*Silva v. Superior Court* (1975), 52 Cal. App. 3d 269, 125 Cal. Rptr. 78.) To deny State courts the power to issue a subpoena would be to negate the terms of the treaty.

■■ Thus, the question before us is not whether a subpoena can be issued, but whether the statute eliminates the criminal contempt power of the State courts where the consul is only an honorary consul. Obviously, the treaty eliminates that power where the consul is a career consul (article 44(1); *United States v. Wilburn* (5th Cir. 1974), 497 F.2d 946), but, as already noted, paragraph one of article 44 is not applicable to honorary consuls, especially those who are residents of the receiving State. Thus, it follows that the treaty does not eliminate the State's contempt powers over honorary consuls.

The language of section 1351 of the Federal Judicial Code is broad and would appear at first glance to apply to proceedings of any kind. But in

---

[4] The petitioner also argues that article III of the Constitution vests exclusive jurisdiction of cases affecting ambassadors and consuls in the U. S. Supreme Court. This, of course, is incorrect. The Constitution merely grants the Supreme Court original but not exclusive jurisdiction (*Bors v. Preston* (1884), 111 U.S. 252, 28 L. Ed. 419, 4 S. Ct. 407), and 28 U.S.C. §1251(b)(1) so provides. Nor is the Federal jurisdiction exclusive unless provided by statute. *Bors v. Preston* (1884), 111 U.S. 252, 28 L. Ed. 419, 4 S. Ct. 407; *DeLeon v. Walters* (1909), 163 Ala. 499, 50 So. 934; *Scott v. Hobe* (1900), 108 Wis. 239, 84 N.W. 181.

fact, as ruled by the United States Supreme Court in *Ohio ex rel. Popovici v. Agler* (1929), 280 U.S. 379, 74 L. Ed. 489, 50 S. Ct. 154, it cannot be so applied. That case which held that the statute was not applicable to divorce proceedings stated at 280 U.S. 280, 383-84, 74 L. Ed. 489, 497-98, 50 S. Ct. 154, 155:

> "The language, so far as it affects the present case, is pretty sweeping, but, like all language, it has to be interpreted in the light of the tacit assumptions upon which it is reasonable to suppose that the language was used. It has been understood that 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States' * * *, and the jurisdiction of the courts of the United States over divorces and alimony always has been denied * * *. A suit for divorce between the present parties brought in the district court of the United States was dismissed. * * *
>
> The words quoted from the Constitution do not, of themselves and without more, exclude the jurisdiction of the state. *Plaquemines Tropical Fruit Co. v. Henderson*, 170 U.S. 511, 42 L. Ed. 1126, 18 Sup. Ct. Rep. 685. *The statutes do not purport to exclude the State Courts from jurisdiction except where they grant it to Courts of the United States*. Therefore, they do not affect the present case if it be true as has been unquestioned for three quarters of a century that the courts of the United States have no jurisdiction over divorce. If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly, and not much in dealing with the statutes. 'Suits against consuls and vice consuls' must be taken to refer to ordinary civil proceedings and not to include what formerly would have belonged to the ecclesiastical Courts." (Emphasis added.)

It was pointed out by the court in *Silva v. Superior Court* (1975), 52 Cal. App. 3d 269, 125 Cal. Rptr. 78, that since the Federal court has no jurisdiction to try consuls for violation of State criminal statutes, jurisdiction over such actions, like the divorce proceedings in *Popovici*, must remain in the State court or the consul will be granted *de facto* diplomatic immunity. But granting a consul *de facto* diplomatic immunity from criminal prosecution is contrary to the express provisions of the Vienna Convention which is controlling. For this reason the court found it did have jurisdiction over a charge the consul was guilty of conspiring to solicit business for an attorney.[5]

---

[5] We are aware, as was the court in *Silva* that *Espinal v. Bayer* (Sup. 1963), 41 Misc. 2d 429, 246 N.Y.S. 2d 107, held, that the State courts did not have jurisdiction over criminal offenses. But as pointed out in *Silva*, the court did not take cognizance of the controlling treaties.

■■ ■ The parties have cited no cases to us, and we have found none, which indicate that a Federal district court has jurisdiction to enforce a State court subpoena and to hold a person in contempt if he fails to testify before a State court or commission. To the contrary, the general rule has always been that only the court offended has the power to punish for the contempt (*Grotnes v. Grotnes* (Fla. App. 1976), 338 So. 2d 1122; *Ogletree v. Watson* (1967), 223 Ga. 618, 157 S.E.2d 464; *Houston v. Hennessey* (Mo. App. 1975), 534 S.W.2d 52), and that therefore disobedience of the order of a State court is not punishable as for contempt by a court of another State or by a Federal court. (17 C.J.S. *Contempt* §51 (1963); *Kirk v. Milwaukee Dust Collector Manufacturing Co.* (C.C. E.D. Wis. 1885), 26 F. 501; *Grotnes v. Grotnes* (Fla. App. 1976), 338 So. 2d 1122.) Indeed, section 401 of title 18 of the United States Code (62 Stat. 701) seems to so limit the contempt power of the Federal courts when it provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

Thus, we find ourselves in the same situation as the California court did in *Silva*. If we do not enforce the subpoena, no one can. Yet "[t]he power to punish for contempt is inherent in courts, as necessary for their self-protection and the maintenance of their dignity, and as an essential auxiliary to the administration of the law and public justice. This power has been recognized from earliest times and from the beginning of judicial administration." (12 Ill. L. & Prac. *Contempt* §51, at 40-41 (1955).) "The contempt power lies at the core of the administration of a State's judicial system." (*Juidice v. Vail* (1977), 430 U.S. 327, 355, 51 L. Ed. 376, 384, 97 S. Ct. 1211, 1217.) Accordingly, we cannot assume that Congress intended to deprive the State courts of their power to punish for contempt where the treaty expressly left the power to enforce a subpoena in the courts and where jurisdiction to so enforce the subpoena was not transferred to the Federal court. Rather we must rule that following *Ohio ex rel. Popovici v. Agler* (1929), 280 U.S. 379, 74 L. Ed. 489, 50 S. Ct. 154, despite the broad language of the statute, it was only meant to exclude the State courts from jurisdiction where that jurisdiction is granted to the courts of the United States.

■■ This conclusion is particularly compelling since Salamie is an honorary consul, not a career consul. Career consuls are not citizens of the

receiving State; their activities are limited to their consular duties; they cannot carry on business in the receiving State. But honorary consuls are not so bound. They may be, as is Salamie, citizens of the receiving State. They may carry on a business in the receiving State. Indeed, since we are not required to be more ignorant than the average man (*Wheeler v. Aetna Casualty & Surety Co.* (1973), 11 Ill. App. 3d 841, 298 N.E.2d 329, *vacated as moot*, 57 Ill. 2d 184, 311 N.E.2d 134), we will take judicial notice that attorneys have acted as honorary consuls. If we were to rule that section 1351 applies to all proceedings, regardless of whether the Federal court has been granted jurisdiction, then not only could the courts of this State not subpoena such a consul to give evidence regardless of the nature of the proceedings, or the State indict him for murder, but our supreme court could not disbar any attorney acting as honorary consul regardless of the heinous nature of his misbehavior. Moreover, his driver's license could not even be revoked since that, too, would be an action or proceeding. The very absurdity of these conclusions forces us to construe the Federal statute in a reasonable manner.

We are not, of course, ruling that Salamie must necessarily answer every question asked by the Commission and produce every document requested. Some may, in fact, be privileged. But as pointed out by the court in *Samad v. The Etivebank* (D. Va. 1955), 134 F. Supp. 530, this cannot be determined until the question has been propounded to the witness. Any such determination should be made in accordance with the views expressed herein.

Reversed and remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

JOHNSON and LINN, JJ., concur.