THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENT FIELDS, Defendant (Kevin Bracy, Contemnor-Appellant).

Fourth District   Nos. 4—87—0792, 4—87—0923 cons.

Opinion filed December 15, 1988.—Modified on denial of rehearing January 13, 1989.

Daniel D. Yuhas and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, for appellant.

John B. Huschen, State's Attorney, of Eureka (Kenneth R. Boyle, Robert J. Biderman, and J.A.C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

Kent Fields was charged in the circuit court of Woodford County with the offense of burglary. Upon Fields' motion, the place of trial was transferred to Ford County, where a jury trial was commenced with Judge Richard Baner presiding. On April 14, 1987, the State called contemnor Kevin Bracy to testify. He refused to do so, claiming a privilege against self-incrimination. The proceedings were suspended for one day so that contemnor might summon his counsel to advise him. The next day, with contemnor's counsel present, he persisted in his refusal to testify and the court found him in direct criminal contempt. On August 14, 1987, after a sentencing hearing before Judge Baner, defendant was sentenced to 165 days' imprisonment. Our case No. 4—87—0792 is contemnor's appeal from the finding of direct criminal contempt and the sentence imposed.

In addition to refusing to answer the question resulting in the direct criminal contempt order, the contemnor refused to answer three questions subsequently propounded to him. The State then filed three petitions, each requesting contemnor be held to have been guilty of contempt for refusing to answer the respective questions. The petitions were consolidated for a jury trial before Judge Dehner. Over contemnor's objection that the case should be tried in Ford County where the alleged contempts occurred, the case was tried in Woodford County. On October 15, 1987, a judgment was entered on jury verdicts finding contemnor guilty of each of the three contempts. A sen-

tencing hearing was later held with Judge Baner presiding. On November 16, 1987, the court sentenced contemnor to three terms of 13 months' imprisonment to run concurrently with each other and with the sentence for direct contempt but consecutively to any other sentence. Our case No. 4—87—0923 concerns contemnor's appeal from these convictions and sentences. The two appeals have been consolidated.

Contemnor contends on appeal: (1) his refusal to testify was justified by his fifth amendment privilege; (2) the court erred in refusing to permit defendant to present evidence and argue in regard to the finding of direct contempt that his conduct was not contemptuous; (3) ruling that contemnor's refusal to testify constituted more than one contempt deprived him of due process; (4) holding the jury trial in Woodford County deprived contemnor of a right to be tried in Ford County where the offense occurred; (5) introduction of evidence at his jury trial of contemnor's conviction of direct contempt erroneously interjected irrelevant and prejudicial information before the jury; and (6) reversible error resulted when Judge Baner, who was a witness at the jury trial, conducted the sentencing.

Contemnor had earlier been charged with the burglary for which Fields was on trial together with two other burglaries. He had pleaded guilty to one of the charges under a plea agreement pursuant to which the other charges had been dismissed in bar of action. Thus, this testimony in regard to the instant offense could not have incriminated him in regard to the instant offense because he could not be prosecuted for that offense. Nevertheless, contemnor has maintained that proof of his acts in committing burglaries, prosecution for which was barred, could be used to show his *modus operandi,* intent or knowledge in regard to other burglaries. See *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

In response to contemnor's assertion that his testimony might incriminate him in other cases, the prosecutor attempted to bestow upon contemnor immunity, which would eliminate any reasonable danger that contemnor's testimony might be incriminating, by making representations he had obtained promises from assistant State's Attorneys in McLean, Peoria, and Tazewell Counties that they would not use evidence of contemnor's conduct in Woodford County in prosecutions against him in their counties. (The questions asked by the State of contemnor all concerned his activities in Woodford County.) However, the contemnor points out that Illinois legislation creating immunity (Ill. Rev. Stat. 1987, ch. 38, pars. 106—1, 106—2) provides only for grants of transactional immunity (*People ex rel. Cruz v. Fitz-*

*gerald* (1977), 66 Ill. 2d 546, 363 N.E.2d 835), and the immunity referred to by the State was clearly only immunity from the use of certain testimony.

■■ We need not analyze in detail any infirmities in the State's theory that contemnor was required to testify as a result of the representations made by the prosecutor. Contemnor was required to testify because he had promised to testify in the prosecution of Fields as one of the conditions of the plea agreement by which his sentence for one burglary was determined and other charges against him dismissed in bar of action. In *People v. Goodwin* (1986), 148 Ill. App. 3d 56, 499 N.E.2d 119, this court held that a defendant who promises, as a part of a plea agreement, to give testimony in aid of the prosecution waives fifth amendment rights in that respect and is subject to a contempt sanction for refusal to do so.

Contemnor contends that the terms of the plea agreement he entered into did not require him to give the testimony involved here. The testimony sought from contemnor here concerned the conduct of himself and others including Fields in the commission of two burglaries in Woodford County. This information was part of that contained in a statement given by defendant to the State, but that statement also contained information about the commission of other offenses in other counties. In a discussion of the nature of the plea agreement between Mr. Harrod, contemnor's counsel in that proceeding, and the court, the following was stated:

"THE COURT: Does the statement relate to any other offenses other than [those] that are being either included today by a conviction or by dismissal?

MR. HARROD: Yes.

THE COURT: Oh, it goes beyond so, [*sic*] he has some Fifth Amendment rights beyond the term of the present charges?

MR. HARROD: Correct.

THE COURT: Okay, and he is agreeing to waive his Fifth Amendment protection with regard to those additional events? In other words, well, it would appear to be obvious that he doesn't have any Fifth Amendment protection with regard to these events.

MR. HARROD: *No he is not* because those statements, or the statement may implicate him with regard to offenses in another county so, therefore, *he is not waiving his Fifth Amendment privilege with regard to offenses that are not within Woodford County.*

THE COURT: So, to the extent this particular statement re-

lates to offenses in another jurisdiction he is not agreeing to testify?

MR. HARROD: In this county, that is correct." (Emphasis added.)

■ Contemnor's theory that he did not agree to give the testimony sought here is based upon his previously described theory that testimony of his conduct in committing burglaries in Woodford County might be used to show *modus operandi* or *intent* with regard to his commission of burglaries elsewhere. He maintains his counsel's statement that he was not waiving his privilege "with regard to offenses not within Woodford County" encompassed within the area of testimony retaining the privilege any evidence which could be used in regard to offenses elsewhere to show *modus operandi* or *intent*. Such an interpretation is completely unrealistic. If that had been intended, the stipulation in regard to testimony would have been of very minimal value to the State. While contemnor's theory is worthy of serious consideration in determining the general scope of his fifth amendment privilege against self-incrimination, we need not apply that theory to give an extremely stark and unlikely interpretation to a carefully considered agreement. We hold that defendant waived his fifth amendment privileges in regard to the questions asked him.

■ Contemnor's assertion the court erred in not allowing him to contest the direct contempt finding at sentencing is based upon the precedent of *Taylor v. Hayes* (1974), 418 U.S. 488, 41 L. Ed. 2d 897, 94 S. Ct. 2697. There, the United States Supreme Court held a State trial court had violated the due process rights of an attorney representing an accused in a murder trial because of the procedure used in finding the lawyer in direct contempt and sentencing him. During the trial, the court on nine occasions informed the lawyer that the court viewed his conduct as contumacious. However, no contempt adjudication was made until after the proceeding. At that time, the court refused to allow the attorney to respond to the proceedings. The Supreme Court concluded that when both the final determination as to the existence of contempt and the punishment are reserved until after the trial, the contemnor should be permitted to respond to both.

Here, the adjudication of direct contempt was made upon the contemnor's refusal to answer a question. This occurred after a long period of argument and discussion. In fact, the court had suspended the case for one day so that the contemnor might obtain the benefit of counsel. Only the sentencing remained to be heard. The trial court did not err in limiting the issues to those involving sentence at sentencing. To have heard further evidence or argument at that time as to

the existence of the grounds for contempt would have been an entirely unnecessary act.

■ The issue of whether the court denied defendant due process when it found him to have committed three additional acts of contempt of court because he refused to answer three other questions presents a difficult problem. The controlling precedent is *Yates v. United States* (1957), 355 U.S. 66, 2 L. Ed. 2d 95, 78 S. Ct. 128. There, that Court held the imposition of 11 consecutive findings of contempt of a party for refusing to answer questions as to whether 11 different people were members of the Communist Party deprived him of due process. The Court held only one contempt had occurred, because the contemnor had stated before the first contemptuous act that she would refuse to answer any questions as to whether a specific person was a Communist if she thought her answer would hurt them. The Court recognized that successive refusals to answer questions by a witness would constitute separate contempts but that only one contempt occurs for refusal to answer when the witness has "carved out an area of refusal." *Yates*, 355 U.S. at 73, 2 L. Ed. 2d at 102, 78 S. Ct. at 133.

Here, the court first found contemnor in direct contempt of court for refusing to answer the question as to who accompanied him during the burglary of a package liquor store in El Paso. In the sequence of questioning at trial, the next refusal to answer a question for which a contempt finding was sought occurred when contemnor refused to answer the question as to how he entered those premises. Later, contemnor was asked whether Fields was with him when he burglarized the El Paso building, and contemnor's refusal to answer became the basis for another request for a contempt finding. Finally, on redirect examination, contemnor refused to answer the question as to how many people were with him when the El Paso burglary was committed.

Contemnor argues in his petition for rehearing that his attorney "carved out" the area upon which contemnor would refuse to testify when, before contemnor was ordered to answer any particular question, the attorney explained that contemnor would exercise his fifth amendment privilege if asked questions which linked contemnor to Fields. Contemnor contends that an area was then described which included questions as to with whom contemnor committed the El Paso burglary and how the building was entered. We do not agree. In *Yates*, the area of refusal was designated when the witness, without claim of privilege, set forth that she would not answer questions which required her to inform on others in regard to their participation

in the Communist Party. Here, no absolute refusal to testify to any question occurred until contemnor was ordered to state who accompanied him in the El Paso burglary. The court and the prosecutor were not required to assume that because contemnor was willing to subject himself to contempt sanctions for refusal to answer that question, he was also willing to subject himself to punishment for refusal to anser a question as to how he entered the El Paso building.

However, when contemnor refused to testify as to whether Fields participated in the El Paso burglary and later refused to tell how many people were with him in committing that burglary, contemnor was refusing to answer questions encompassed by an area which had been "carved out" by his previous refusals. Accordingly, we hold that under the precedent of *Yates*, a contempt finding made by the jury for contemnor's refusal to testify as to how he entered the premises of the El Paso package liquor store did not deny contemnor of due process, but the other two findings of contempt made by the jury did deprive him of due process and must be set aside.

Contemnor's theory that the court erred in overruling his objection to holding the jury trial on the three contempt petitions in Woodford County rather than Ford County is based on (1) the holding in *Bloom v. Illinois* (1968), 391 U.S. 194, 20 L. Ed. 2d 522, 88 S. Ct. 1477, that a contempt proceeding is much the same as a criminal proceeding and thus the right of trial by jury exists if a sanction more severe than six months of imprisonment is to be imposed, and (2) the provision of section 1—6 of the Criminal Code of 1961 which states that, except under circumstances not applicable here, "[c]riminal actions shall be tried in the county where the offense was committed." Ill. Rev. Stat. 1987, ch. 38, par. 1—6.

The decision in *Bloom* was made on *certiorari* to the supreme court of Illinois with regard to the latter's decision in *People v. Bloom* (1966), 35 Ill. 2d 255, 220 N.E.2d 475, *cert. granted* (1967), 386 U.S. 1003, 18 L. Ed. 2d 431, 87 S. Ct. 1346. The Illinois Supreme Court had held that because a contempt proceeding was "not a criminal prosecution but a proceeding to vindicate the dignity of the court and enforce its orders" (*Bloom*, 35 Ill. 2d at 258, 220 N.E.2d at 477), one charged with contempt, regardless of the serious nature of the charges, was not entitled to a jury trial. That court affirmed a finding of contempt and a sentence of 24 months' imprisonment for indirect criminal contempt. The Unites States Supreme Court concluded that a contempt proceeding was substantially similar to a criminal proceeding and held that due process required that one charged with indirect criminal contempt when imprisonment in excess of six months is

sought to be imposed was entitled to a jury trial.

■ Nothing in the United States Supreme Court decision in *Bloom* indicates that due process necessarily requires a person be tried for indirect criminal contempt in the county where the contempt occurred nor does the opinion indicate due process requires that a person charged with contempt be given all of the protection given by a State to persons charged with crimes. The Illinois Supreme Court indicated in *Bloom* that the essence of criminal contempt is the effrontery of the contemnor to the court. Only the court offended has the power to punish for the offense. (*Illinois Commerce Comm'n v. Salamie* (1977), 54 Ill. App. 3d 465, 369 N.E.2d 235.) The court offended here was the circuit court of Woodford County which, at the time of the alleged contempts, was sitting in Ford County to afford Fields a trial away from the publicity which had, apparently, been pervasive in Woodford County. Clearly, under these circumstances, neither due process nor any Illinois statutory or criminal law principle required the circuit court of Woodford County to go to Ford County to try the question of whether contemnor's conduct in Ford County was in contempt of the circuit court of Woodford County.

Contemnor's theory as to the proper place of trial for indirect criminal contempt could raise a serious question if followed. Many court orders require or prohibit acts occurring outside of its county. If the circuit court of Woodford County should order an estranged spouse to refrain from disturbing the other spouse and that order is disobeyed by an act taking place in Ford County, how, consistent with contemnor's theory, would the Woodford County court enforce its order?

The circuit court of Woodford County did not err in trying the indirect contempt proceedings in Woodford County.

■ Judge Baner testified at the contempt trial and detailed the explanations he had given to contemnor. He related how the contemnor first refused to answer a question and was held in direct contempt. Contemnor argues that evidence of the first contempt finding improperly indicates to the jury that the contemnor had a propensity for wrongful conduct in violation of the rule set forth in *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489. While the evidence did have that prejudicial quality, the evidence also bore heavily upon the contemnor's character of contumacious refusal and was properly admitted.

■ Finally, we consider contemnor's contention that error resulted when Judge Baner, who had appeared as a witness, became the sentencing judge. Ordinarily a judge is required to recuse himself

when he is a potential witness in a case. (*People v. Wilson* (1967), 37 Ill. 2d 617, 230 N.E.2d 194.) Furthermore, in a criminal case, the judge presiding at the trial is ordinarily required to sentence. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1(b).) On the other hand, when a court finds a person is in direct criminal contempt and imposes the sentence, the judge is, to some extent, the victim, the sole witness, and the person imposing punishment. We recognize that the proper procedure to use in the unusual circumstances involved here is not readily apparent. However, when the indirect contempt procedure is used in regard to a contempt taking place in the face of the court, as here, the purpose of doing so is mostly to afford the alleged contemnor insulation from any possible prejudice that may arise because of animosity the affronted judge may have. This purpose is defeated if that judge imposes the punishment. The problem is compounded when that judge has been a witness. We hold error resulted here when Judge Baner was required to sit for sentencing.

We affirm the finding that contemnor was in direct contempt of court and the sentence of 165 days' imprisonment imposed thereon. We also affirm the judgment entered on the jury verdict finding contemnor in contempt for refusing to answer the question in regard to how he entered the package liquor store in El Paso. We reverse the sentence entered on that finding and remand to the circuit court for resentencing on that determination of contempt with the sentencing to be conducted by Judge Dehner, if possible, and, in any event, with the sentencing to be conducted by a judge other than Judge Baner. We reverse the other judgments of contempt and the sentences imposed thereon.

Affirmed in part; reversed in part and remanded with directions.

McCULLOUGH, P.J., and SPITZ, J., concur.